433 F.3d 320
 NEW YORK STATE LAW OFFICERS UNION, District Council 82, Afscme, Afl-Cio, by its President Ron Hoyt, Plaintiff,
Ron Hoyt, Plaintiff-Appellant,
v.
Christopher C. ANDREUCCI, individually and in his official capacity as Deputy County Executive of Albany County, James Campbell, individually and in his official capacity as Sheriff of Albany County, John Mahan, individually and in his official capacity as Undersheriff of Albany County, and County of Albany, Defendants-Appellees.
Docket No. 04-5551-CV.
 United States Court of Appeals, Second Circuit.
 Argued: November 18, 2005.
 Decided: January 6, 2006.
 
 Elmer Robert Keach, III, Law Offices of Elmer Robert Keach, III, PC, Amsterdam, NY, for Plaintiff-Appellant.
 John W. Bailey, Law Offices of John W. Bailey & Associates, P.C., Albany, NY, for Defendant-Appellee Christopher C. Andreucci.
 Robert P. Roche, Roche, Corrigan, McCoy & Bush, Albany, NY, for Defendants-Appellees James Campbell and John Mahan.
 Michael J. Smith, Hiscock & Barclay, LLP (Catherine M. Hedgeman, on the brief), for Defendant-Appellee County of Albany.
 Before: SOTOMAYOR and KATZMANN, Circuit Judges, and EATON, Judge.*
 KATZMANN, Circuit Judge.
 
 
 1
 In this case, we are called upon to assess whether various officials of Albany County violated the First Amendment rights of a corrections officer by retaliating against him on the basis of his speech.
 
 
 2
 The plaintiff-appellant, Ron Hoyt, has long been employed by Albany County as a corrections officer and has been involved in union activities for many years. After being elected to a leadership position in Council 82, a statewide labor organization, Hoyt was granted a full-time leave to fulfill his union responsibilities, pursuant to a written agreement between Council 82 and Albany County. The Leave Agreement added, however, that Hoyt could not "personally represent Council 82 in grievances, administrative proceedings or other labor matters in which Albany County is a party." This provision came into sharp relief when, during the public comment portion of an Albany County Legislature meeting, Hoyt gave a speech that criticized defendant-appellee Undersheriff John Mahan and referred to a pending grievance between an unnamed corrections officer and Albany County. The next day, defendant-appellee Deputy County Executive Christopher Andreucci informed Hoyt that his speech had breached the Leave Agreement, and that he therefore had to return to regular duty as a corrections officer.
 
 
 3
 Hoyt reluctantly returned to work at the correctional facility, and then filed the instant lawsuit under 42 U.S.C. § 1983, alleging that the defendants-appellees had violated his constitutional rights by retaliating against him because of his speech. The district court (Strom, J.) awarded summary judgment to the defendants-appellees, holding as a matter of law that the revocation of Hoyt's union leave did not amount to an adverse employment action. We hold, however, that the question of whether the revocation of Hoyt's leave rose to the level of an adverse employment action implicates material issues of fact, thus precluding resolution at the summary judgment stage. We further hold that the district court's entry of summary judgment cannot be affirmed on either of the two alternative grounds advanced by the defendants-appellees: namely, that Hoyt's speech was not constitutionally protected; and that even if it were, the Leave Agreement operated to waive any constitutional right that Hoyt had to deliver the speech. We therefore vacate the district court's award of summary judgment and remand this case for further proceedings.
 
 I.
 A.
 
 4
 Hoyt, a corrections officer at the Albany County Correctional Facility, has been involved in union activities for over two decades. In 1980, he became a steward of Local 775, the labor union representing corrections officers in Albany County, and he quickly rose to become Local 775's President.
 
 
 5
 In 1995, Hoyt was elected Law Enforcement Policy Chairman of Council 82, the statewide parent organization of Local 775. In early 1996, Council 82 and Albany County negotiated an agreement pursuant to which Hoyt would take leave from his position as a corrections officer in order to perform his responsibilities for Council 82, with Council 82 reimbursing Albany County for Hoyt's salary and benefits. Specifically, the Leave Agreement provided as follows:
 
 
 6
 Beginning February 5, 1996, Mr. Hoyt will be granted a paid leave of absence by the Sheriff and County ("Employer") for the duration of his tenure as Council 82 Law Enforcement Policy Chairman. During that period of time, the Employer will continue to pay Mr. Hoyt his salary, longevity payments, clothing allowance, sick leave incentive and other contractual compensation items, and it will also continue to make contributions to the New York State Retirement System and pay for Mr. Hoyt's health insurance and any other medical insurances that may be negotiated in future contracts. The salary, other compensation items, Retirement System contributions and health insurance payments will be made in accordance with the collective bargaining agreements in effect from time to time and in the same manner as such are made with other active County Correction Officers in the employ of the Employer. Mr. Hoyt's accruals will be frozen at the amount credited to him on February 4, 1996, except that Mr. Hoyt will be credited with five (5) personal days upon his return to active service with the Albany County Sheriff's Department.
 
 
 7
 In consideration of the Employer granting Mr. Hoyt this leave with pay, Council 82 will reimburse the Employer, on a quarterly basis, amounts attributable to annual salary, longevity, clothing allowance, sick leave incentive payments made to Mr. Hoyt, Retirement System contributions made on behalf of Mr. Hoyt, health insurance premiums paid on behalf of Mr. Hoyt by the Employer and social security amounts attributable to compensation paid to Mr. Hoyt.
 
 
 8
 
 Finally, as part of this arrangement, Mr. Hoyt will not personally represent Council 82 in grievances, administrative proceedings or other labor matters in which Albany County is a party.
 
 
 
 9
 (Emphasis added.) The italicized portion — which is central to this dispute — was not in the original draft of the agreement, but did appear in the final version. According to Robert Hite, Council 82's general counsel at the time, this language was inserted at the request of Albany County.
 
 
 10
 For the next six years (with the exception of one 30-day period during which Hoyt voluntarily returned to the corrections facility), Hoyt remained on full-time leave pursuant to the above agreement, which was periodically renewed, and he ultimately rose to become President of Council 82. The most recent renewal of the Leave Agreement extended Hoyt's union leave through September 30, 2002.
 
 
 11
 On the night of February 13, 2002, however, a pivotal incident occurred when Hoyt made a speech during the open public comment period of the Albany County Legislature's monthly meeting. During his speech, Hoyt criticized defendant-appellee Undersheriff John Mahan, alleging that Mahan was unlawfully taking union members out of their "bid jobs" as a means of disciplining them, and that he should therefore be removed from his position as Undersheriff. Because the text of Hoyt's speech is at the crux of this dispute, we have reproduced it in full:[1]
 
 
 12
 Mr. Chairman, members of the County Legislature, my name is Ron Hoyt. I'm president of Council 82, the parent organization which represents Local 775, Corrections Officers at the Jail.
 
 
 13
 Let me first qualify my following remarks by saying, it's just like being a nurse at a pediatric ward at a hospital, and your boss gets mad at you and wants to discipline you, and then you find yourself when you come to work the next day being moved over to another area. Or you're a member of the Department of Public Works here in Albany County, you're a truck driver. Your boss comes in, gets mad at you, and the next day you're cutting grass.
 
 
 14
 And I'm very troubled by being here tonight. I don't feel comfortable in this position tonight. But the contract officers at the jail have the entitlement to bid duty assignments by seniority. There are also procedures set forth to address discipline. Management cannot bleed these together. In short, they cannot utilize taking an officer off his or her bid job as a means of discipline. This has been legally proven. This matter may not appear to be an issue for this venue. However, those of you that are familiar with organized labor know members live and die by seniority.
 
 
 15
 On December 10, 2001, Undersheriff John Mahan attended a meeting along with Superintendent Tom Wigger and heard numerous complaints and concerns from officers, between meetings there were 180 officers that attended this meeting. Mr. Mahan looked Vice President Tom Carroll from [Local] 775 square in the eye and said he would not utilize taking officers out of their bid job as discipline. Less than one month later, he suspended an officer for 30 days and took him out of his bid job for 60 days. Which, incidentally, when this thing goes to arbitration, taking him out of his bid job had nothing, absolutely nothing, to do with why he was suspended. We believe this is personal. We have absolutely no problem with the Sheriff or the Undersheriff suspending this guy. That's what we have in our procedure. We'll go to arbitration. We'll deal with it in that venue.
 
 
 16
 But we do have a problem with Mr. Mahan's credibility. If an officer lies, they get suspended or fired. Mr. Mahan has breached the credibility of the position of undersheriff. He has stated that he has violated the deputy sheriff's contract almost on a daily basis, and he will violate the corrections officers at the Albany County Correctional Facility.
 
 
 17
 The behavior exhibited by Mr. Mahan is a direct assault on our members and your employees. As county employer, this governing body and Mr. Breslin, our county executive, cannot allow Undersheriff's ego to replace respect. The Sheriff must not allow the Undersheriff to compromise the integrity of the Undersheriff's office and allow Mr. Mahan to continue to lie to his employees and violate their contract simply because he is the boss. The Sheriff must not allow, and this union will not stand by idly, while one individual misuses his power simply because he thinks he can.
 
 
 18
 Keep in mind, Mr. Wigger-the Superintendent of the facility-was present. Those of you that know him I think will agree with me. He has been a friend for an awful long time, and he deserves the position he is in and he has got a lot of credibility. I can only hope, from our standpoint of view, from a labor standpoint of view, that Mr. Wigger and his staff on a daily basis will not track behind Mr. Mahan and what he has accomplished after December 10th.
 
 
 19
 Mr. Mahan should resign from his position as undersheriff, and he — if he doesn't, he should be removed. Do we think that this is actually going to happen? Absolutely not. It's not going to happen. But, we're going to ask all of you that support labor and the labor unions in this district to stand shoulder to shoulder and send a very strong message that the treatment of the county employees, whether that be a nurse that works at that correctional facility, or that be a correction officer that works at that facility.
 
 
 20
 There is no other union or private company in New York State that would take somebody out of their bid job and move them out simply because he had the power to do it, and it was illegal to begin with.
 
 
 21
 [Chairman: You have 30 seconds.]
 
 
 22
 Let me leave you with this one last note. If anybody can be a boss and demand respect. But it takes a true leader, a true leader, to be the boss and command respect. And on the other thing, the privatization. My apathy certainly lies with management but my sympathy lies with the public employees.
 
 
 23
 Thank you.
 
 
 24
 There is no dispute that in the italicized portion above — wherein Hoyt mentioned an unnamed officer who had been suspended for 30 days and taken out of his bid job for 60 days, and whose case was going to be handled in arbitration — Hoyt was referring to corrections officer Matthew Anton. As of February 13, 2002, Anton had filed a grievance against Albany County.
 
 
 25
 It is similarly undisputed that during the days preceding Hoyt's February 13, 2002 speech, various Albany County officials had learned of Hoyt's plans to criticize Undersheriff Mahan and to refer to the Anton dispute, and had warned Hoyt — as well as Council 82 Staff Director Richard Stevens — that if Hoyt went ahead with this plan, his union leave would be revoked. Indeed, on the very afternoon of February 13, 2002, Director Stevens spoke with Deputy County Executive Andreucci about the fact that Hoyt was planning to refer to the Anton matter in his remarks to the County Legislature that night. Stevens later explained that he had hoped the Anton grievance could be resolved in order to avoid Hoyt's "having to speak" about it before the County Legislature. According to Stevens, Andreucci responded that if Hoyt "speaks[,] we are going to bring him back to work." Hoyt himself was also acutely aware of the threat of revocation of his union leave. At his deposition, he recalled that "Mr. Mahan had sent two individuals. . .[who] basically threatened me that if I go down in front of the legislature, that they would pull my union release time." Nonetheless, Hoyt did not believe that he would actually be violating the Leave Agreement by speaking to the County Legislature about the matters in question, and he went ahead with his plan to make the speech that night.
 
 
 26
 Shortly after Hoyt delivered the above speech, Deputy County Executive Andreucci and Sheriff James Campbell consulted with the Albany County Attorney and other county officials to determine whether Hoyt's speech had violated the terms of the Leave Agreement. They concluded that it had, and on February 14, 2002, Andreucci sent a letter to Stevens, who served as Hoyt's supervisor at Council 82. In this letter, Andreucci wrote that Hoyt's statements "on behalf of Council 82 before the Albany County Legislature during its monthly meeting on February 13, 2002 violated the Agreement between Council 82 and the County of Albany. The leave of absence permitted by the Agreement, therefore, will not be continued." The letter went on to declare that "[s]hould Mr. Hoyt wish to continue receipt of the salary and benefits provided by the Agreement, he is to return to full duty as a Correction Officer on Thursday, February 21, 200[2][2] at 6:45 A.M."
 
 
 27
 On February 20, 2002, Hoyt sent a letter to Sheriff Campbell in response to this notification. Hoyt disputed the notion that he had made any statements violating the terms of the Leave Agreement, asserting that "I simply made statements on a matter of public concern during the public comment portion of the Legislature's monthly meeting. Mr. Andreucci's letter is nothing more than a calculated, baseless and unlawful attempt to chill my and Council 82's rights of free speech and free association, and it will not be tolerated." He added that "[i]nasmuch as you are my employer, I expect that any order for me to return to work should issue from you or your office." Sheriff Campbell wrote back later that day, and stated that "I agree with the Deputy County Executive's determination that your comments made on behalf of Council 82 at the February 13, 2002 County Legislative Meeting violated the Agreement between Council 82 and the County of Albany. Thus, I concur with the conclusion that your leave of absence may not be extended to the following extent: Please be advised that you are to return to full duty as a Correction Officer on Thursday, February 21, 2002 at 6:45 a.m."
 
 
 28
 Hoyt complied with the order and returned to duty as a corrections officer on February 21, 2002.
 
 B.
 
 29
 Upon returning to work as a corrections officer, Hoyt proceeded to file the instant lawsuit. His complaint included several constitutional claims, all of which were predicated on the notion that the revocation of his union leave amounted to retaliation for the exercise of his First Amendment rights to free speech and free association.[3]
 
 
 30
 After discovery, the defendants moved for summary judgment, on grounds that (1) Hoyt's February 13, 2002 speech did not relate to a matter of public concern and therefore was not constitutionally protected; (2) even assuming that the speech did relate to a matter of public concern, Council 82 and Hoyt had waived — pursuant to the Leave Agreement — Hoyt's constitutional right to make the speech in question; and (3) Hoyt's leave was simply a special privilege and the revocation of this leave did not amount to an adverse employment action.[4] Hoyt, meanwhile, cross-moved for partial summary judgment.
 
 
 31
 The district court subsequently granted the defendants' motion for summary judgment. Hoyt v. Andreucci, No. 02-CV-0226, 2004 WL 2414158 (N.D.N.Y. Sept. 30, 2004). Finding the question of whether Hoyt suffered an adverse employment action dispositive, the district court discussed only that element of Hoyt's First Amendment retaliation claim. It observed that when Hoyt's union leave was revoked, he was allowed to resume his original position as a corrections officer, with all of his benefits intact. Id. at *3. The court further stated that there was no provision under Hoyt's employment contract or under the law that entitled Hoyt to full-time leave, and concluded that such leave was therefore not a "term or condition of Hoyt's employment as a corrections officer." Id. Finally, in response to Hoyt's argument that the revocation of his union leave had resulted in his loss of $25,000 (because he was no longer an officer in Council 82), the district court asserted that Hoyt could have remained as an officer in Council 82 even after being returned to his corrections officer duties, but voluntarily resigned from the presidency of Council 82 in May of 2002. Id. at *4. The district court thus concluded that "there is no genuine factual issue as to whether Hoyt suffered an adverse employment action at the hands of the defendants," id., and, on that basis, granted the defendants' motions for summary judgment.
 
 
 32
 This appeal followed.
 
 II.
 A.
 
 33
 At the outset, we note the applicable standard of review. "We review a grant of summary judgment de novo, construing the record in the light most favorable to the non-moving party." Bourdon v. Loughren, 386 F.3d 88, 92 (2d Cir.2004). An order granting summary judgment will be affirmed only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 260 (2d Cir.2005).
 
 B.
 
 34
 As the district court stated, for a public employee to succeed on a First Amendment retaliation claim under Section 1983, she must show her speech was constitutionally protected, that she suffered an adverse employment action, and that there is a causal relationship between her utterance of the speech and the subsequent adverse employment action. See, e.g., Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir.2004) (citing Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999)). Because the district court based its decision solely on the conclusion that the revocation of Hoyt's full-time union leave was not an adverse employment action, it is there that we begin.
 
 
 35
 We note, as an initial matter, that Hoyt contends that because he was on union leave during the time in question, the above-described public employee framework is inapplicable to his case. Specifically, Hoyt argues that he should not be required to show that he suffered an adverse employment action, and that it should instead suffice for him to establish that the loss of his union leave amounted to the loss of a valuable governmental benefit.[5]
 
 
 36
 We find unconvincing Hoyt's argument that the general framework governing public employees is inapplicable here. The Leave Agreement — in expressly referring to Albany County as Hoyt's "employer," and providing for Council 82 to reimburse Albany County for Hoyt's salary and benefits, rather than for Council 82 to pay Hoyt directly — made clear that Hoyt would remain a public employee throughout his leave period. It is not surprising, therefore, that in his own February 20, 2002 letter to Sheriff Campbell, Hoyt expressly referred to Sheriff Campbell as his "employer," stating that "[i]nasmuch as you are my employer, I expect that any order for me to return to work should issue from you or your office." Moreover, the deprivation of which Hoyt complains is directly and specifically related to the terms of his public employment, i.e., the County's revocation of his leave and requirement that he report for duty as a corrections officer. We conclude that this case fits squarely within the public employee framework, and that the district court therefore properly identified, as a dispositive issue, the question of whether Hoyt had suffered an adverse employment action.
 
 
 37
 We disagree, however, with the district court's ultimate conclusion that the February 14, 2002 revocation of Hoyt's full-time union leave was, as a matter of law, not an adverse employment action. This Court has previously defined the concept of an adverse employment action broadly, explaining that "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. We also have held that lesser actions may meet the adversity threshold, but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action." Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir.2002) (internal quotation marks and citations omitted). Indeed, whether an undesirable employment action qualifies as being "adverse" is a heavily fact-specific, contextual determination. See, e.g., Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir.1997) ("Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of `adverse.'"). In making this inquiry, an important consideration is whether the action is one that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Washington, 373 F.3d at 320 (internal quotation marks omitted).
 
 
 38
 In this case, construing the facts most favorably to Hoyt as the non-moving party, we believe that there is sufficient evidence upon which a reasonable fact-finder could conclude that the revocation of Hoyt's full-time union leave amounted to an adverse employment action. Hoyt's job responsibilities and work duties were substantially altered when, on February 14, 2002, he was ordered to return to his position as a corrections officer. As he described his duties as a union officer while on leave, he presided over meetings with State entities and other unions, assisted in organizing new workers and in preparing for various arbitration proceedings, engaged in legislative affairs, and generally "was responsible for the overall daily activities of Council 82." By contrast, once Hoyt's union leave was revoked, he had to report for duty at the Albany County jail and work as the booking officer in the Admissions and Discharge unit. Additionally, because he believed that he could not adequately perform his work as an officer for Council 82 on a part-time basis, Hoyt resigned his executive position with Council 82, for which he had been paid an additional stipend.
 
 
 39
 In short, viewing the facts in the light most favorable to Hoyt, it appears that as a result of the February 14, 2002 directive ordering him back to duty as a corrections officer, all of Hoyt's job responsibilities — not to mention the physical location of his job — changed. We believe that a the prospect of a wholesale reassignment of job duties, to the extent that occurred here, could "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Washington, 373 F.3d at 320.
 
 
 40
 It is certainly true that, as the district court noted, Hoyt was not entitled under a personal employment contract to this full-time leave; indeed, the Leave Agreement was not between Hoyt and Albany County, but rather between Albany County and Council 82. It is also undisputed that, when Hoyt's union leave was revoked, he was returned to the position as a corrections officer that he had held before his leave began, with all of his benefits preserved. The Leave Agreement did expressly state, however, that Hoyt would be on full-time leave to do work for Council 82 until September 30, 2002. Accordingly, Hoyt certainly had reason to believe that, unless he violated the Leave Agreement, he would remain on full-time leave to perform union responsibilities until at least September 30, 2002. We therefore believe that the district court went too far in holding that as of February 14, 2002, Hoyt's full-time leave was — as a matter of law — not "a significant aspect of [Hoyt's] employment relationship with the County." Hoyt, 2004 WL 2414158, at *3 (internal quotation marks omitted). We conclude that the question of whether the revocation of Hoyt's full-time leave amounted to an adverse employment action should have been reserved for the jury, and that the district court erred in holding otherwise and entering summary judgment on that basis.
 
 C.
 
 41
 Our conclusion that the district court erred in holding that the revocation of Hoyt's union leave was not an adverse employment action does not end our inquiry. The defendants-appellees also raised, both before the district court and on appeal, two additional arguments for granting summary judgment in their favor: (1) that Hoyt's speech was not constitutionally protected because it did not relate to a matter of public concern; and (2) that the Leave Agreement operated to waive any constitutional right possessed by Hoyt to engage in the speech at issue. Either of these arguments would, if successful, dispose of this case. We therefore consider each of them in order to determine whether there exists an alternative ground for affirming the district court's entry of summary judgment. See, e.g., Alfaro Motors, Inc. v. Hon. Benjamin Ward, 814 F.2d 883, 887 (2d Cir.1987).
 
 1.
 
 42
 We start with the issue of whether Hoyt's speech was constitutionally protected, which presents a question of law. Morris, 196 F.3d at 110. As we have previously explained, the inquiry of whether a public employee's speech was protected by the First Amendment proceeds in two parts. Lewis v. Cowen, 165 F.3d 154, 161-62 (2d Cir.1999). We must initially decide whether the speech addressed a matter of public concern. Id. at 161. If we conclude that the speech did address a matter of public concern, we must then balance the employee's First Amendment right to engage in the speech against the interest of the government employer in providing effective and efficient public service, in a weighing commonly referred to as the Pickering balancing test. Id. at 162 (citing Connick v. Myers, 461 U.S. 138, 150, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).
 
 
 43
 The defendant-appellees, focusing on the first prong of the above analysis — namely, whether Hoyt's speech related to a matter of public concern — raise two related arguments. First, they argue that Hoyt's speech, on its face, amounted only to complaints about internal policies of the Albany County Sheriff's Department, and did not raise issues of broader public concern. In assessing whether an employee's speech addresses a matter of public concern, we consider "the content, form, and context of a given statement as revealed by the whole record." Lewis, 165 F.3d at 163. In so doing, we evaluate whether the speech relates to "any matter of political, social, or other concern to the community," Morris, 196 F.3d at 110 (internal quotation marks omitted), and whether the speech "was calculated to redress personal grievances or whether it had a broader public purpose," Lewis, 165 F.3d at 163-64. It is true, of course, that mere employee grievances do not qualify as matters of public concern. See, e.g., Connick, 461 U.S. at 147-49, 103 S.Ct. 1684 (1983); Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir.1991). We disagree, however, that Hoyt's speech raised only an internal employee grievance. An examination of Hoyt's speech demonstrates that it was framed in terms of advising the Albany County Legislature that one of its employees — Undersheriff Mahan — was disciplining corrections officers in an unlawful manner. We view concerns raised to the government about the lawfulness of public officials' actions as implicating a matter of public interest, and thus conclude that on its face, Hoyt's speech related to a matter of public concern. See, e.g., Johnson v. Ganim, 342 F.3d 105, 108, 112-14 (2d Cir.2003) (holding that employee's letter raising claims of unfair labor practices and corrupt behavior on the part of high-ranking officials in the city government amounted to speech on a matter of public concern).
 
 
 44
 Second, the defendants-appellees argue that Hoyt's speech did not relate to a matter of public concern because his motives in making this speech were purely personal in nature: namely, to exact revenge on Undersheriff Mahan because of personal dislike and animosity toward him, and to further the objectives of Corrections Officer Matthew Anton and Council 82. Viewed in the light most favorable to Hoyt, however, the record suggests that Hoyt's speech was motivated at least in part by concerns stemming from his role as a public citizen. Indeed, Hoyt has expressly stated that prior to the events that prompted his February 13, 2002 speech, his relationship with Undersheriff Mahan had been "congenial," and that he gave the speech because he "had concerns not only as an employee[, but] also as a citizen of this County to what I believed was unjust conduct by Undersheriff Mahan." Given the factual dispute as to Hoyt's motives, we are unable to hold as a matter of law that Hoyt's speech was not constitutionally protected. See Gorman-Bakos, 252 F.3d at 557-58 (holding that where factual disputes as to parties' motives bear on the ultimate legal question of whether a public employee's speech was protected by the First Amendment, the underlying factual disputes should be decided by a fact-finder before the district court reaches a legal conclusion).[6]
 
 2.
 
 45
 Nor can we affirm summary judgment on the final ground advanced by the defendants-appellees: that even assuming that Hoyt's February 13, 2002 speech was constitutionally protected, he waived his right to make the statement before the Albany County legislature because it fell within the category of speech prohibited by the Leave Agreement.
 
 
 46
 As noted above, the relevant provision of the Leave Agreement forbade Hoyt from "personally represent[ing] Council 82 in grievances, administrative proceedings or other matters in which Albany County is a party." There is, of course, no dispute that in Hoyt's speech to the Albany County Legislature, he identified himself as the President of Council 82 and referred to a pending grievance between Albany County and a corrections officer. Hoyt has also admitted that he made the speech in hopes of encouraging the Legislature to provide assistance in the matter. It is unclear from the express text of the Leave Agreement, however, whether it prohibited Hoyt only from participating in adversarial grievance proceedings themselves, as Hoyt contends, or whether its prohibition against "personally represent[ing] Council 82 in .... other matters in which Albany County is a party" also encompassed speaking to the County Legislature about pending grievances between a corrections officer and Albany County, as the defendants-appellees contend. Indeed, a March 27, 2002 letter sent by defendant-appellee Sheriff Campbell and Albany County Executive Michael Breslin to members of the Albany County Legislature admitted that "[t]he vagueness of this provision in the original agreement led to our current situation."
 
 
 47
 Where, as here, the meaning of a particular contractual provision is ambiguous and the intent of the parties cannot be determined from the contractual language itself, the ambiguity presents a question of fact to be resolved by a jury. Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n, 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 298 N.E.2d 96 (1973); accord Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir.2005) ("[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.") (internal quotation marks omitted). In determining the meaning of the language at issue, the jury may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract. See, e.g., Big Tree Energy Partners v. Bradford, 219 A.D.2d 27, 640 N.Y.S.2d 270, 273 (3d Dep't 1996) (considering the parties' course of dealing and course of performance in determining the meaning of a contract term); Ruttenberg v. Davidge Data Sys. Corp., 215 A.D.2d 191, 626 N.Y.S.2d 174, 178-79 (1st Dep't 1995) (denying summary judgment and holding that parol evidence was admissible because the contract term was ambiguous and the parties' intent was not apparent from the face of the agreement). Therefore, because of the factual dispute about the scope of the Leave Agreement's limitation on Hoyt's speech, the Agreement does not provide a basis upon which to affirm the district court's entry of summary judgment.
 
 III.
 
 48
 For the foregoing reasons, we hereby vacate the judgment of the district court granting summary judgment to the defendants-appellees, and remand this case for further proceedings.
 
 
 
 Notes:
 
 
 *
 The Honorable Richard K. Eaton, Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 The text is taken from a transcription of Hoyt's oral remarks. For ease of reading, we have inserted the appropriate punctuation and paragraph breaks
 
 
 [2]
 The letter gave the date as February 21, 2001, but this is clearly a typographical error
 
 
 [3]
 Hoyt's complaint also included a third-party beneficiary breach of contract claim as to the Leave Agreement, which, as noted above, was between Albany County and Council 82. This claim was subsequently withdrawn
 
 
 [4]
 The defendants also moved for qualified immunity on the part of Deputy County Executive Andreucci, Undersheriff Mahan, and Sheriff Campbell. The district court did not reach this issue and it is not before us on appeal
 
 
 [5]
 In support of this argument, Hoyt attempts to analogize his situation to the circumstances considered by the Ninth Circuit inHyland v. Wonder, 972 F.2d 1129 (9th Cir.1992), a case involving a government volunteer's loss of his position. There, the Ninth Circuit held that it was irrelevant whether the volunteer could be classified as a public employee, because the critical question was whether the volunteer had "alleged the loss of a valuable governmental benefit or privilege in retaliation for his speech." Id. at 1136. This Circuit has not yet addressed whether "claims of termination from volunteer positions based on protected conduct are equivalent to, or should be analyzed different from, more traditional claims of termination from salaried government positions," Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County, 252 F.3d 545, 551 n. 2 (2d Cir.2001), and, for the reasons set forth in our discussion of Hoyt's argument on this point, we need not do so here.
 
 
 [6]
 We note that the defendants-appellees' argument is premised on the assumption that Hoyt's internal motives for making the speech bear on whether the speech touched on a matter of public concern in the first place, as opposed to bearing solely on the subsequentPickering balancing analysis. We have assumed arguendo, solely for purposes of this appeal, that this is correct. In fact, although our precedents indicate that employee speech stemming solely from a private interest will be entitled to little if any constitutional protection, see, e.g., Lewis, 165 F.3d at 164, White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir.1993), we have not expressly spoken to whether this is because such motives indicate that the speech did not relate to a matter of public concern at all, or because the interests of an employee with such motives will be entitled to little weight in the subsequent Pickering balance. One district court in this Circuit has recently reached the latter conclusion. See Reuland v. Hynes, 2004 WL 2098664, at *3, 2004 U.S. Dist. LEXIS 18784, 01 CV 5661, at *23 — 25 (E.D.N.Y. Sept. 17, 2004) (interpreting this Circuit's precedents to hold that "[t]o the extent that motivation is relevant in removing speech that otherwise addresses a matter of public concern from the protections of the First Amendment, it does so not at the threshold question of whether the speech addresses a matter of public concern, but rather in the Pickering balance.").