464 F.3d 217
 Martin ZELNIK, Plaintiff-Appellant,
v.
FASHION INSTITUTE OF TECHNOLOGY, State University of New York, Joyce F. Brown, individually as President of Fashion Institute of Technology, State University of New York, Defendants-Appellees.
Docket No. 05-5131-CV.
 United States Court of Appeals, Second Circuit.
 Argued: May 19, 2006.
 Decided: September 14, 2006.
 
 Judith P. Broach, (Joshua S.C. Parkhurst, on the brief), Broach & Stulberg, LLP, New York, N.Y., for Plaintiff-Appellant.
 Victor A. Kovner (Peter Karanjia, on the brief), Davis Wright Tremaine, LLP, New York, N.Y., for Defendants-Appellees.
 Before: MINER and POOLER, Circuit Judges, and RAKOFF, District Judge.*
 MINER, Circuit Judge.
 
 
 1
 Plaintiff-appellant Martin Zelnik ("Zelnik") appeals from a summary judgment entered in the United States District Court for the Southern District of New York (Swain, J.) in favor of defendants-appellees, Fashion Institute of Technology, State University of New York ("FIT"), and the President of FIT, Dr. Joyce Brown ("Brown"). Zelnik brought this action to remedy alleged deprivations of the right of free speech, the right of free association, and the right to petition the government for redress of grievances. The alleged deprivations were pleaded in claims made pursuant to 42 U.S.C. § 1983; the First and Fourteenth Amendments to the United States Constitution; and Article I, Sections 8 and 9 of the New York State Constitution. A claim of defamation also was alleged, pursuant to New York State law, but was later voluntarily withdrawn by Zelnik. Following cross-motions for summary judgment, the District Court granted the motion of the defendants-appellees and dismissed the Complaint. The District Court determined that Zelnik could not establish that he had suffered an "adverse employment action," an element of his prima facie case, as he was unable to demonstrate the loss of a benefit resulting from FIT's retaliatory failure to afford him professor emeritus status. The District Court also found that no reasonable fact-finder could have determined that the conduct of defendant-appellee Brown constituted harassment of the type that would have deterred a reasonable person from exercising his free speech rights. The District Court's dismissal of Zelnik's First Amendment claim for failure to demonstrate retaliation by adverse employment action is the only ruling challenged on appeal. For the reasons that follow, we affirm the judgment of the District Court.
 
 BACKGROUND
 
 2
 Zelnik is a retired faculty member of the Fashion Institute of Technology ("FIT"). FIT, located in New York City, is a public institution of higher learning in the State University of New York ("SUNY") system. FIT is located in a single block on West 27th Street between Seventh and Eighth Avenues in Manhattan. Brown has been FIT's president since June of 1998.
 
 
 3
 Zelnik was a member of the FIT faculty from 1969 through December of 1999, holding the title of Professor in the Interior Design Department at the time of his retirement. During Zelnik's thirty years of service at FIT, he made major contributions to the Interior Design Department and the school and served in many leadership positions. Zelnik occasionally has taught classes at the school as an Adjunct Professor since his retirement.
 
 
 4
 Zelnik is also a 50% owner of a six-and-a-half-story building located at 242 West 27th Street (between Seventh and Eighth Avenues). This building is situated on the same block as the FIT buildings. Zelnik and his joint business partner of thirty-five years, Julius Panero ("Panero"), operate their architecture and interior design practice, Panzel Development Associates ("Panzel"), there. Zelnik and Panero purchased the property for approximately $90,000 some years ago. Zelnik estimated the property to be worth approximately $5 million in October of 2004.
 
 
 5
 I. Zelnik's Opposition to the Streetscape Project
 
 
 6
 Sometime in February of 1999, Zelnik, as a property owner, received a letter from a law firm representing FIT, informing him that FIT intended to permanently close a portion of 27th Street between Seventh and Eighth Avenues as part of its "Streetscape" Project ("Streetscape" or the "Project"). This Project involved designs to create a campus-type environment for FIT on the closed portion of 27th street. Streetscape originally was proposed in 1979 in response to a traffic accident that resulted in an injury to a student. As originally conceived, Streetscape called for turning all or a substantial portion of West 27th Street into a pedestrian area mall, which would be closed to all thru-traffic. The original plans called for the remainder of West 27th Street to be left open for two-way traffic, with the navigable portion of West 27th Street terminating in a cul-de-sac and "turnaround" for vehicles directly outside the FIT building in which the President's office is located. The 1979 plans, however, never were actualized.
 
 
 7
 The 1999 design of the Streetscape Project was substantially similar to the original 1979 design, but the "turnaround" was to be placed near Zelnik's property at 242 West 27th Street. Although Zelnik generally was in favor of the Streetscape Project, he and other members of the community formed an informal organization called the "27th Street Block Association" (the "Association") to discuss FIT's Streetscape plans and propose alternatives.
 
 
 8
 Zelnik's activity on behalf of the Association included, inter alia, various efforts in opposition to the Project. For example, after attending a July 1999 meeting with representatives from FIT and other interested parties regarding Streetscape, Zelnik prepared and distributed a memorandum to community members outlining his concerns about various aspects of the proposed Project. In that letter, Zelnik raised his concern that the portion of the street remaining open for automobile traffic, culminating in a cul-de-sac or "turnaround," presented a danger to pedestrians. Given as an example was the exposure of pedestrians to danger from large trucks maneuvering through the turnaround.
 
 
 9
 Also in July of 1999, Zelnik wrote a letter to a New York City Commissioner regarding the Association's opposition to Streetscape. In September 1999, Zelnik wrote a letter to FIT on behalf of the Association, asking for additional information. In March of 2000, Zelnik's business partner, Panero, spoke before two community boards on behalf of himself and Panzel and described the Streetscape project as a "disaster waiting to happen."
 
 
 10
 In June of 2000 Zelnik wrote a letter to a New York State Assemblyman, explaining the potential safety problems with the Streetscape design and traffic flow. Zelnik stated in that letter that the project would create a condition that would "ultimately result in the loss of life and limb and will cause serious bodily damage to students, staff, faculty, residents and tenants of the block."
 
 
 11
 In October of 2000, Panzel, the Association, and other individual petitioners (collectively, the "Petitioners") commenced an Article 78 proceeding, pursuant to the New York State Civil Practice Law and Rules, in the Supreme Court of the State of New York, County of New York, against the Dormitory Authority of the State of New York ("DASNY") and the Department of Transportation ("DOT") to block the execution of the Project. The Petitioners sought (i) to annul and vacate the relevant "approvals granted and the environmental quality findings made" by DASNY NY and DOT; (ii) to declare "the State Environmental Quality Review Negative Declaration issued by DASNY to be in violation of the State Environmental Quality Review Act and 6 N.Y.C.R.R. Part 617"; (iii) to declare "the City Environmental Quality Review Negative Declaration issued by DOT to be in violation of City Environmental and Quality Review, and Mayoral Executive Order 91 of 1977"; (iv) to annul and vacate, or prohibit, certain DOT designations of the relevant streets; and (v) costs and "other and further relief as is just and proper." The Article 78 proceeding was eventually dismissed by the court but reinstated by the New York State Appellate Division, First Department. The Petitioners subsequently failed to pursue this litigation.
 
 
 12
 In February of 2001 Zelnik gave an interview to a reporter with the Village Voice, a New York City weekly news publication, which was a part of a published article discussing the "traffic nightmare for private businesses and residents at the block's western end" and FIT's "small assault on the quality of everyday life — imposed by politically powerful players — that turns complacent New Yorkers into outraged citizen warriors ready to descend on city hall." In March of 2001, Zelnik wrote a letter to the editor of the daily newspaper, Newsday. In that letter, Zelnik described the Project as a "dead-end crisis that will also end up being a potential killer."
 
 
 13
 II. Professor Zelnik's Nomination for the Status of Professor Emeritus
 
 
 14
 In June of 2000, the Interior Design Department (the "Department") nominated Zelnik for "emeritus status." According to FIT, emeritus status is "an exceptional honor signifying excellence and one that is rarely granted." Indeed, it appears that emeritus status at FIT has been conferred only once in the past decade. President Brown noted that emeritus status has "no remuneration" but brings with it only a "continued association with the institution and the value that such status would confer." FIT views professors with emeritus status as "representative[s] of the college." Zelnik asserts that emeritus status brings with it tangible benefits, as well as prestige, status, and respect "within FIT and the wider academic and professional communities." FIT takes the position that emeritus status carries with it no real benefit beyond the honorific title.
 
 
 15
 Zelnik claims that all faculty members in the past who (i) have met the requisite criteria for emeritus status and (ii) have either requested emeritus status, or have been nominated for emeritus status, have ultimately received emeritus status.[1] In the past twenty years, every retired Full Professor who met the threshold criteria for a conferment of emeritus status, and who had been nominated by his department for emeritus status, had ultimately received such status by the Board of Trustees.
 
 
 16
 The criteria and procedures for obtaining emeritus status were established by resolutions of the Board of Trustees of FIT and are published in the FIT Faculty Handbook. Currently at FIT, and during the time that the underlying events of this action took place, in order to satisfy the criteria to have emeritus status conferred a faculty member (i) must have held the rank of Full Professor at the time of retirement; (ii) must have been a member of the faculty of the college for a minimum of twenty-five years or a "prime mover in the introduction, organization, and development of a department or an area of study within a department in the college which has been continued for a minimum of ten years"; and (iii) must have "gained recognition in the college for the quality of service to [FIT] above and beyond the requirements of the positions held." (emphasis in original). Neither the Faculty Handbook nor any other FIT publication describes any specific benefits attached to Professor Emeritus status.
 
 
 17
 The procedures for the conferral of emeritus status, according to the Board of Trustees' resolution dated October 21, 1991, are as follows. First, the retired full Professor must be nominated by the Department or Divisional Dean. Next, the Vice President of Academic Affairs must receive the nomination and recommendation from the Division Dean. Third, the President of FIT must receive the nomination and recommendation from the Vice President of Academic Affairs. Finally, the President of FIT must recommend the nomination to the FIT Board of Trustees, who then may approve the nomination.
 
 
 18
 By memorandum dated February 8, 2000, following Zelnik's retirement, Professor Joan Melnick of the FIT Interior Design Department proposed that the Department nominate Zelnik for emeritus status. The Department's faculty unanimously voted in favor of the proposal on May 18, 2000. On June 1, 2000, Frank Memoli, Chair of the Interior Design Department, by memorandum, notified the FIT Board of Trustees, Brown, and Dario Cortes, Vice President for Academic Affairs of FIT, of the nomination and requested their "concurrence and approval in the granting of [the] well-deserved distinction."
 
 
 19
 Approximately six months after Brown was notified of the recommendation, Nicholas Politis ("Politis"), a faculty member in the Department, contacted Brown's assistant to inquire as to the status of the nomination. Politis was informed that the nomination was still on Brown's desk. In February 2001, Politis again inquired about the status of Zelnik's nomination, and Politis was told that, although it was still on Brown's desk, it was "at the bottom of the pile." In April 2001, after a third inquiry, Politis was explicitly told that the delay in reviewing appellant's nomination was due to Zelnik's opposition to the Streetscape project.
 
 
 20
 The Department sent a memorandum, dated December 12, 2001, to Brown inquiring about FIT's failure to respond to, or act on, Zelnik's nomination for emeritus status. In that memorandum, the Department stated that it had been informed by Brown's office that the nomination was put "on hold" and that "[i]t has been suggested by some that the reason for [the] delay is the fact that Professor Zelnik was among those in the community that voiced their opposition to the proposed Streetscape plan, as designed."
 
 
 21
 On January 4, 2002, Brown responded by memorandum to the faculty members of the Department, stating that she had been in receipt of the December 12, 2001, memorandum; that "[e]meritus status is an honor, not a right"; that a "faculty member does not achieve it automatically upon the completion of a list of stated requirements"; that the fact that the Department voted to nominate Zelnik "does not require [FIT] to endorse the nomination uncritically"; and that the "procedures to be followed in evaluating a nomination once made . . . have not been followed . . . making your request to [Brown] at the very least premature." Brown then stated in that memorandum that the "threshold criteria" for emeritus consideration were set forth in the Faculty Handbook (Part III, section M.5) and that "[i]t is only on completion of those requirements that the faculty member is `entitled to request' [nomination for] the honor of the emeritus title."
 
 
 22
 While Brown stated in her memorandum of January 4, 2002, that the failure to recommend Zelnik for emeritus status was not due to his voiced opposition to Streetscape and that she "welcome[d] the opinion of every member of the FIT community on every project that the College takes on," Brown also stated:
 
 
 23
 Professor Zelnik did not simply join members of the community in opposing the Streetscape plan because of fears that it "posed a threat to the safety and welfare of the community. . . ." Rather, Professor Zelnik owns property at that end of 27th Street, and his interest in opposing the plan was personal, involving access to his building. Professor Zelnik confirmed that fact when he continued his efforts to prevent Streetscape, unabated, even after the College responded to his complaints and those of his fellow property owners by enhancing the scenic aspects of that end of the street, as they had demanded, and by moving the turnaround farther east to facilitate access to their property. Our concessions did nothing to stanch Professor Zelnik's efforts to prevent Streetscape.
 
 
 24
 Furthermore, Professor Zelnik has chosen to advance those personal interests in a manner that is nothing less than dishonorable. He has falsely impugned the College's motives, intentions, and reputation in a very public way, and has joined the chorus of accusers charging the [C]ollege with irresponsible behavior and of deliberately endangering the welfare of the elderly, the young, and the infirm in order to selfishly take real estate away from the community in pursuit of an "elitist" agenda. . . .
 
 
 25
 Thus, even if Professor Zelnik had met the threshold requirements for consideration, and even if you had obtained the necessary administrative recommendations, I could not in good conscience recommend that the College honor Professor Zelnik at this time. There is nothing that would require the object of Professor Zelnik's slanderous statements — our College — to pay honor to the individual maligning it, and I would not recommend that it do so.
 
 
 26
 Brown concluded her memorandum, however, by stating that she "might consider" recommending Zelnik's nomination in the future once litigation between Zelnik and FIT had terminated.
 
 
 27
 On November 21, 2002, the Department again nominated Zelnik for emeritus status. This nomination followed the procedures established by the FIT Board of Trustees and included a recommendation to the Dean of the Art and Design Division. Brown, on March 28, 2003, responded by a memorandum to Takashyi Kamiya, the Chair of the Interior Design Department, in which she recognized that the nomination "follow[ed] the procedures and criteria established by the Faculty Handbook and the Board of Trustees" in that the Department requested recommendations from the Division Dean and the Vice President for Academic Affairs. Brown explained, however, that she had considered the nomination "anew" and found "nothing in it that would persuade [her], at [that] time, to recommend the elevation of Professor Zelnik to emeritus status to FIT's Board of Trustees." Brown once again stated that Zelnik "dishonored FIT in his personal behavior in the course of his opposition to our proposed Streetscape plan." Brown noted in her memorandum of March 28 that while the Dean of Arts and Design had recommended the designation of Zelnik as Professor Emeritus, the Vice President of Academic Affairs had not made the same recommendation. FIT does not raise this procedural omission as part of its argument on appeal. To this date, Zelnik has not yet been granted the status of Professor Emeritus by FIT.
 
 III. Proceedings in the District Court
 
 28
 Zelnik filed his Complaint in the United States District Court for the Southern District of New York on October 16, 2003, alleging, pursuant to 42 U.S.C. § 1983, violations of his First Amendment and New York State Constitutional rights. Following discovery, the parties cross-moved for summary judgment. In a decision read from the bench on September 2, 2005, the District Court dismissed Zelnik's Complaint in its entirety. The District Court, citing Galabya v. New York City Bd. of Educ., 202 F.3d 636 (2d Cir.2000), determined that Zelnik could not prove one of the prima facie elements of a First Amendment retaliation claim, to wit, an adverse employment action. According to the court, Zelnik failed to demonstrate that denial of emeritus status was a materially adverse change in the terms and conditions of employment. Specifically, the court found that Zelnik had failed to demonstrate that he suffered a demotion or other detriment in his current terms of FIT employment, as the status of Professor Emeritus was simply an honorific title, which carried no additional benefits. The District Court, citing Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir.2002), also found that Zelnik failed to establish a sufficient pattern of repeated and severe incidents of workplace harassment that, taken as a whole, would probably deter an average person from the exercise of their First Amendment rights.
 
 
 29
 Judgment was entered on September 7, 2005. Notice of Appeal was filed on September 23, 2005. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 DISCUSSION
 I. Standard of Review
 
 30
 A district court's grant of summary judgment is reviewed de novo. Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir.2005). This Court "utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998). A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir.1997). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). However, with respect to a properly supported summary judgment motion, the party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).
 
 II. Definition of Adverse Employment Action
 
 31
 As this Court has recently reaffirmed, [w]here the plaintiff is a public employee alleging that he suffered an adverse employment action as retaliation for the exercise of his First Amendment rights, . . . a plaintiff must initially show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest, . . . (2) he or she suffered an adverse employment action, . . . and (3) the speech was at least a substantial or motivating factor in the [adverse employment action]. . . .
 
 
 32
 Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir.2005) (per curiam) (selected alterations in Morrison); see also Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir.2004). For purposes of the instant appeal, defendants-appellees have "concede[d] that [Zelnik's] speech related to a matter of public concern and that [Brown's] decision not to grant emeritus status was linked to his speech." Apparently, they also concede that Zelnik is an employee, despite his status as a retiree. Moreover, it is uncontested that Zelnik exercised his right of speech as a private citizen and not as part of his official duties. Cf. Garcetti v. Ceballos, ___ U.S. ___, ___, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006) (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline").
 
 
 33
 Accordingly, the only issue here is whether Zelnik is able to demonstrate that he suffered an adverse employment action. The gravamen of Zelnik's argument as presented to this Court is that the term "adverse employment action" has a different meaning in free speech retaliation cases than in Title VII and other discrimination cases and that the District Court applied the incorrect standard for measuring his adverse employment action claims. Zelnik also argues that the District Court erred in finding that the status of Professor Emeritus does not confer any tangible benefits and that FIT and its officials did not engage in conduct that would have deterred a reasonable similarly situated individual from exercising his or her First Amendment rights.
 
 
 34
 Galabya, the case upon which the District Court relied, involved a claim of discrimination brought pursuant to the Age Discrimination in Employment Act of 1967, Pub.L. 90-202, 81 Stat. 602 (codified at 29 U.S.C. §§ 621 et seq.) ("ADEA"). In that case, we determined that "[a]n adverse employment action" within the meaning of the relevant legal standards is generally characterized as a "materially adverse change in the terms and conditions of employment." Galabya, 202 F.3d at 640 (internal quotation marks omitted). It may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Id. at 640. Because Zelnik could not demonstrate any material change in the terms and conditions of his employment, the District Court granted summary judgment to the defendants.
 
 
 35
 The standard applied by the District Court, however, is a more demanding standard than the one we have applied to First Amendment retaliation claims. "In the context of a First Amendment retaliation claim, we have held that `[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.'" Washington v. County of Rockland, 373 F.3d 310, 320 (2d. Cir.2004) (quoting Dawes v. Walker, 239 F.3d 489, 493 (2d Cir.2001) (alteration in Washington)); see also Hoyt v. Andreucci, 433 F.3d 320, 328 (2d Cir.2006). In this context, "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). This list of retaliatory conduct is certainly not exhaustive, however, and "lesser actions may also be considered adverse employment actions." Id. "Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." Id. (citing Bernheim v. Litt, 79 F.3d 318, 324-26 (2d Cir.1996)).
 
 
 36
 While our cases thus have recognized a number of employment actions that we have characterized as adverse, we are guided by the general rule that "whether an undesirable employment action qualifies as being `adverse' is a heavily fact-specific, contextual determination." Hoyt, 433 F.3d at 328.[2] A plaintiff cannot support such a determination unless he can show that an alleged act of retaliation is more than de minimis. See Davidson v. Chestnut, 193 F.3d 144, 150 (2d Cir.1999) (collecting cases). Indeed, "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise. . . ." Bart v. Telford, 677 F.2d 622, 625 (7th Cir.1982).
 
 
 37
 Zelnik quotes a passage in Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), for the proposition that the First Amendment protects public employees "from even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights," id. at 75 n. 8, 110 S.Ct. 2729 (internal quotation marks and citation omitted), but the quoted language is dicta and should not be read "literally," see Pierce v. Tex. Dep't of Criminal Justice, Institutional Div., 37 F.3d 1146, 1149 n. 1 (5th Cir.1994) ("We choose not to read the Supreme Court's dicta literally; rather, we apply the main analysis of Rutan to retaliation claims and require more than a trivial act to establish constitutional harm."); Davidson, 193 F.3d at 150 (characterizing the "birthday party" passage as dicta). The Supreme Court quoted the "birthday party" passage from the opinion of the Seventh Circuit Court of Appeals in that case, Rutan v. Republican Party of Illinois, 868 F.2d 943, 954 n. 4 (7th Cir. 1989), which in turn inaccurately characterized the circuit's own holding in Bart. See Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir.1999) (recounting the history of the "birthday party" passage).
 
 
 38
 In Bart the court strongly indicated that not holding a birthday party would be de minimis and would not, therefore, support a retaliation claim. 677 F.2d at 626. However, in Bart the employee was "ridicule[d] for bringing a birthday cake to the office on the occasion of the birthday of another employee," even though bringing a birthday cake into work for another employee's birthday was a common practice in the office. Id. at 624. Moreover, this ridicule was considered a part of a larger "campaign of harassment which though trivial in detail may have been substantial in gross," and therefore was actionable. Id. at 625. This Court's jurisprudence has recognized such "substantial in gross" claims before. See Phillips, 278 F.3d at 109 ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass."). As noted, the District Court found that Zelnik could not demonstrate such a "critical mass."
 
 
 39
 By focusing on "material adverse changes" in Zelnik's employment, rather than on the effect of FIT's actions on the exercise of free speech rights of a "person of ordinary firmness," we hold that the District Court applied the wrong standard to Zelnik's First Amendment retaliation claim. This conclusion is bolstered by the Supreme Court's recent decision in Burlington Northern and Santa Fe Ry. Co. v. White, ___ U.S. ___, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). In Burlington Northern the Court held that "the anti-retaliation provision" of Title VII "is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 2412-13. Instead, the Court held that "actionable retaliation" was that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (internal quotation marks omitted). This Court has never held that a public employee plaintiff alleging retaliation in violation of the First Amendment must demonstrate a material change in employment terms or conditions. Our standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in Burlington Northern.
 
 
 40
 Although we conclude that the District Court applied an incorrect standard in defining adverse employment action in the First Amendment retaliation context, the error is of no consequence. We simply do not believe, based upon our review of the factual record, that a jury could conclude that the denial of, or the refusal to consider for, emeritus status would deter an individual of ordinary firmness, situated similarly to Zelnik, from exercising his free speech rights under the facts in this case. See Washington, 373 F.3d at 320.
 
 
 41
 We hold that the failure to afford Professor Emeritus status to Zelnik was not an adverse action because the benefits of such status, given the record before us, carry little or no value and their deprivation therefore may be classified as de minimis. See Davidson, 193 F.3d at 150. The benefit of emeritus status, such as it is in this case, is merely honorific. Zelnik has adduced no evidence in the record before us that a professor with emeritus status at FIT is entitled to any benefit or item of value beyond what is afforded to other retired faculty members. Zelnik alleges that professors with emeritus status at FIT are entitled to the use of FIT facilities and services. However, nothing in the record demonstrates what specific facilities and services are implicated. In any event, it appears that all retired professors are entitled to use certain FIT facilities. Zelnik therefore is entitled to the benefit of those facilities as a retired professor. His status as an Adjunct Professor also affords him access to certain institutional facilities when he is employed in that capacity. Moreover, Zelnik's title as a retired Full Professor remains intact.
 
 
 42
 Insofar as Zelnik claims that the status of professor emeritus carries with it things of intangible value, such as prestige, status, and respect within the FIT and wider academic community, he has failed to adduce any evidence of such matters beyond his conclusory statements. However, because the finding of an adverse employment action "is a heavily fact-specific, contextual determination," Hoyt, 433 F.3d at 328, we do not determine that denial of emeritus status could never support a finding of First Amendment retaliation. Indeed, at some institutions other than FIT, emeritus status apparently carries with it specific and well-defined benefits. See, e.g., JAMES E. MAUCH, JACK W. BIRCH, & JACK MATTHEWS, EMERITUS RANK IN MAJOR RESEARCH UNIVERSITIES: RETIREE PERQUISITES AND PRIVILEGES, EDUC. RES. INFO. CTR., U.S. DEP'T OF EDUC., OFFICE OF EDUC. RESEARCH AND IMPROVEMENT 1, 14 (1993) (summarizing the results of a questionnaire sent to members of the American Association of Universities regarding the "rights, opportunities[,] and eligibilities" extended to faculty retirees and emeriti of research universities and reporting that at some institutions retirees with emeritus rank are awarded "significantly more perquisites" than retired faculty in general), at http://www.eric.ed.gov. See generally JAMES E. MAUCH, JACK W. BIRCH, & JACK MATTHEWS, INSTITUTIONAL. PLANNING FOR EMERITUS FACULTY, EDUC., RES. INFO. CTR., U.S. DEP'T OF EDUC., OFFICE OF EDUC. RESEARCH AND IMPROVEMENT 16 (1990) (encouraging educational institutions to "put real meaning and distinction into the emeritus rank and reserve it for active and interested faculty" and noting that "[f]aculty then might be more likely to treat the rank as an opportunity to make additional contributions, rather than as an honorific title without responsibilities or challenges"), at http://www.eric.ed.gov.
 
 
 43
 Zelnik did present to the District Court a declaration from a former FIT employee, Victoria Barbero, who worked in the FIT President's Office, attesting to tangible benefits afforded to professors emeriti. These benefits, according to Barbero, were enumerated in an unproduced university document and were "office space, access to FIT's library and a phone line." The document was said to have existed "during [her] tenure," which ended before Zelnik's retirement. Barbero attributes the non-existence of the document to a supposition that the "document must have been misplaced at some time between 1998 and the present." The current employee holding Barbero's position, Jeffrey Slonin, and the Vice President of Human Resources and Labor Relations at FIT, Annette Piecora, attested to the fact that the records of FIT do not contain such a document. We agree with the District Court that the affirmation of Barbero was insufficient to raise a genuine issue of material fact as to whether professors emeriti at FIT are afforded anything of value. It is significant that FIT does not have in place any written description of the benefits attendant to emeritus status.
 
 
 44
 It should also be noted that the criteria for receiving Professor Emeritus status are vague, imprecise, and highly discretionary. Such standardless criteria necessarily entail subjective determinations and do not permit this Court to ascertain or quantify the likelihood of an award of emeritus status to retired a Full Professor at FIT. The uncertainty of having the title of emeritus status conferred further undermines the potential value of such status. As a consequence, it is even less likely that an individual of ordinary firmness would be deterred or dissuaded from exercising his free speech rights if threatened with the withholding of this purely honorific title. We have considered all of Zelnik's other claims and find them to be without merit.
 
 CONCLUSION
 
 45
 In accordance with the foregoing, the summary judgment entered in the District Court dismissing Zelnik's Complaint is hereby affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable Jed S. Rakoff, District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Neither party claims that satisfaction of the threshold criteria for emeritus status, coupled with either a request for emeritus status made by the retired professor or a nomination from the department,automatically entitles a retired Full Professor to emeritus status.
 
 
 [2]
 We also note that although a public employee "may be required to show that the adverse action is of a type that, objectively `would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights,'" Morrison, 429 F.3d at 51 (quoting Washington, 373 F.3d at 320), this Court has not held that "a public employee plaintiff is required to show that the defendants' action had an actual chilling effect." Id. (emphasis supplied). "[I]t is well settled that public employees alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them." Id. (quoting Gill v. Pidlypchak, 389 F.3d 379, 382 (2d Cir.2004)) (emphasis omitted).