Shannon MORRIS, an individual, Melissa Lee, an individual, and Kevin Rafferty, an individual, Plaintiffs,

v.

NEW YORK STATE POLICE, Margaret Nancy Poulin, individually and in her official capacity as New York State Police Captain, Timothy Munro, individually and in his official capacity as New York State Police Major, Julie A. Pizziketti, individually and in her official capacity as Director of Biological Science, New York State Police Forensic Investigation Center, Ray Wickenheiser, individually and in his official capacity as Director, Crime Lab System, New York State Police Forensic Investigation Center, Superintendent Joseph D'Amico, individually and in his official capacity as Superintendent of the New York State Police, and Steve Hogan, individually and in his official capacity as First Deputy Counsel of the New York State Police, Defendants.

1:16–CV–164

United States District Court, N.D. New York.

Signed August 8, 2017

BAILEY, JOHNSON PC, Attorneys for Plaintiffs, OF COUNSEL: JOHN W. BAILEY, ESQ., CRYSTAL R. PECK, ESQ., 5 Pine West Plaza, Suite 507, Washington Avenue Extension, Albany, NY 12205

HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, Attorneys for Defendant, OF COUNSEL: MARIA E. LISI–MURRAY, ESQ., SHANNAN C. KRASNOKUTSKI, ESQ., Ass't Attorneys General, The Capitol, Albany, NY 12224

**MEMORANDUM–DECISION
and ORDER**

DAVID N. HURD, United States District Judge

**TABLE OF CONTENTS**

I. INTRODUCTION...352

II. BACKGROUND...352

III. DISCUSSION...358

A. Eleventh Amendment Immunity...359

B. 42 U.S.C. § 1983...360

1. First Amendment Retaliation...360

 i. Matter of Public Concern...361

 ii. Speech as a Citizen...362

C. Discrimination Claims...362

1. Gender Discrimination...363

2. Hostile Work Environment...366

3. Retaliation...368

D. Common Law Claims...369

IV. CONCLUSION...370

## I. INTRODUCTION

Plaintiffs Shannon Morris ("Morris"), Melissa Lee ("Lee"), and Kevin Rafferty ("Rafferty") (collectively "plaintiffs") have filed this civil rights action against the New York State Police (the "State Police"); State Police Captain Margaret Nancy Poulin ("Captain Poulin"); State Police Major Timothy Munro ("Major Munro"); Julie A. Pizziketti, the Director of the State Police Forensic Investigation Center's (the "Crime Lab") Biological Sciences Division ("Director Pizziketti"); Ray Wickenheiser, the Director of the Crime Lab ("Director Wickenheiser"); State Police Superintendent Joseph D'Amico ("Superintendent D'Amico"); and Steve Hogan, First Deputy Counsel of the State Police ("Deputy Counsel Hogan") (collectively "defendants").

Plaintiffs' proposed pleading[1] enumerates eighteen causes of action against de-fendants based on federal and state law that fall into three broad categories: (1) claims under 42 U.S.C. § 1983 alleging retaliation for the exercise of their First Amendment rights (First, Second, and Eleventh Causes of Action) and in violation of their Fourteenth Amendment right to equal protection under the U.S. Constitution (Twelfth Cause of Action) as well as under Article 1, Section 11 of the New York State Constitution (Fourteenth Cause of Action); (2) claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and related state law for gender discrimination, retaliation, and a hostile work environment (Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Thirteenth Causes of Action); and (3) claims under state law for defamation and libel (Fifteenth, Sixteenth, Seventeenth, and Eighteenth Causes of Action).

On April 25, 2016, defendants moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) seeking to dismiss plaintiffs' then-operative complaint in its entirety for failure to state any claims upon which relief could be granted. Plaintiffs opposed and cross-moved to amend their complaint. Defendants replied and opposed the motion to amend. Both motions have been fully briefed and have been considered on the basis of the submissions without oral argument.

## II. BACKGROUND[2]

Between 1996 and 1997, the State Police hired Morris, Lee, and Rafferty to work as forensic scientists at its Crime Lab in Albany, New York. Pls.' Proposed Second Am. Compl. ("Compl.") ¶¶ 3–4, 28–29, 50–

---

1. Plaintiffs initially amended their complaint as of right on April 1, 2016 to, inter alia, eliminate a John Doe defendant in favor of naming Deputy Counsel Hogan.

2. For reasons explained below, the following factual allegations are drawn from plaintiffs' proposed second amended complaint, ECF No. 22–1, and are assumed true for purposes of resolving defendants' motion to dismiss.

51, 110. Lee and Rafferty, who each held the title of "Supervisor of Forensic Sciences," worked directly under Morris, an Associate Director of Biological Sciences at the Crime Lab. Id. ¶¶ 4, 29–30, 51–52. And although Director Pizziketti was only an Assistant Director of the Crime Lab at the time, plaintiffs claim she was widely considered to be the facility's "de facto" leader. See id. ¶¶ 5, 85, 253, 257. Accordingly, Morris is alleged to have reported directly to Pizziketti. See id.

Forensic scientists employed by the Crime Lab are responsible for analyzing DNA and other evidence collected during criminal investigations. Compl. ¶¶ 110–11. During the time period relevant to this action, the Crime Lab used the Combined Probability of Inclusion ("CPI") method of evaluating DNA samples. Id. ¶ 114.

As plaintiffs explain, the CPI method has a subjective component to it, creating a risk that a scientist who examines a suspect's DNA profile *before* analyzing an unknown DNA sample recovered from a crime scene (a practice referred to as "suspect-centric" analysis) might improperly determine that the two are a match. Compl. ¶¶ 116, 125–27. Plaintiffs further allege that the CPI method is unable to accurately distinguish between two DNA samples if they are from related individuals. Id. ¶ 126.

According to plaintiffs, these shortcomings in the CPI method have drawn criticism from the leading scientific agencies in charge of promulgating training and standards for evaluating DNA evidence. Compl. ¶¶ 115–116, 132–143.

Notably, however, the CPI method is not the only DNA analysis tool available. In 2001, the State of New York entered into a contract with a private company to train forensic scientists at the Crime Lab in how to use a more advanced, computerized DNA system known as "TrueAllele." Compl. ¶ 158–160. Plaintiffs allege that TrueAllele removes the subjective, interpretive component from the analysis of DNA crime scene evidence and claim that it is considered a superior method of analysis by the scientific accrediting agencies mentioned above. Id. ¶ 162.

Between 2001 and 2014, the State Police took steps to replace the CPI method with TrueAllele at the Crime Lab under the leadership of Dr. Barry Duceman, who served as Director of the facility at the time. Compl. ¶¶ 158, 166, 258. During the period of time this implementation process overlapped with their respective terms of employment, Morris, Lee, and Rafferty allege they were vocal advocates in favor of adopting the TrueAllele DNA evaluation method. Id. ¶¶ 9, 33, 54–55. Plaintiffs also allege that they were openly critical of certain Crime Lab administrators, including Director Pizziketti, who failed to support the transition to TrueAllele.[3] Id. ¶¶ 129–30, 154–56. In fact, plaintiffs allege that Director Pizziketti "routinely encouraged" her fellow scientists to use "suspect-centric" DNA analysis despite the well-known, widespread criticism toward that approach. Id.

At some point in 2013, Dr. Barry Duceman was replaced as head of the Crime Lab by Director Wickenheiser, marking a shift in workplace politics that would ultimately give rise to plaintiffs' lawsuit. Compl. ¶ 258. From then on, Director Pizziketti reported to Director Wickenheiser and Major Munro. See id. ¶ 292. According

---

**3.** Morris also pioneered the implementation of Lean Six Sigma, a workplace efficiency program, during this time period. Compl. ¶¶ 11–12. Between 2013 through December 2015, Lee and Rafferty were involved in implementing Lean Six Sigma at the Crime Lab. Id. ¶¶ 34, 36.

to plaintiffs, Director Pizziketti and Director Wickenheiser routinely allowed Crime Lab scientists to "testify to questionable DNA results" in criminal proceedings. Id. ¶ 156. Plaintiffs further allege that Deputy Counsel Hogan was aware of, and also "approved" of, this questionable practice. Id. ¶ 157.

According to plaintiffs, Director Pizziketti began to mistreat and bully other female scientists, aggressively disciplining female scientists who violated protocols but failing to mete out similar punishment to male employees. Compl. ¶¶ 253–56, 259–63. Plaintiffs further allege that Director Pizziketti would "yell, grunt[,] and snarl" at them, assign Morris extra work assignments, and purposefully exclude and isolate her in the workplace. Id. ¶¶ 278–279. Plaintiffs contend Director Pizziketti would also "publicly humiliate" Morris at staff meetings "by undermining her competency and yelling, groaning[,] and scowling" at her during work presentations. Id. ¶ 280.

Between 2013 and 2014, plaintiffs reported this behavior to various members of the administration, who directed Major Munro to conduct a mediation session in 2014 in an effort to curtail Director Pizziketti's behavior. Compl. ¶¶ 282–286, 290. Even after the mediation session, however, Director Pizziketti's alleged misconduct continued. Id. ¶ 291.

To make matters worse, plaintiffs allege that Director Pizziketti, Director Wickenheiser, Deputy Counsel Hogan, and Superintendent D'Amico deliberately set out to undermine the Crime Lab's implementation of TrueAllele because these administrators feared it would expose the fact that prosecutors and the State Police had knowingly been using inaccurate DNA results to prosecute certain criminal cases.[4] Compl. ¶¶ 167, 172–77.

Eventually, the State Police's long-planned implementation of the TrueAllele DNA program required a series of group training courses in which thirty-seven forensic scientists, including plaintiffs, were taught how to use TrueAllele. Compl. ¶¶ 181–83. During this training period, plaintiffs allege that the scientist-trainees were permitted and encouraged to collaborate with each other. Id. ¶ 193. According to plaintiffs, permissible collaboration included "sharing pretests, sharing informational binders, sharing lessons and answers to lessons," and "assisting one another to answer questions on the examinations." Id. ¶ 194. Plaintiffs allege that this collaboration "was common knowledge within the Crime Lab and was accepted by the Crime Lab's leadership." Id. ¶ 193. Morris, Lee, Rafferty, and several dozen other forensic scientists engaged in this collaboration. Id. ¶¶ 180–81.

Thereafter, at some point during the fall of 2014, Lee and Rafferty reported to Morris that Director Pizziketti "was testifying as an expert in criminal cases in areas in which she was neither competent nor proficient to testify." Compl. ¶¶ 36, 58. Plaintiffs notified various accrediting agencies about Director Pizziketti's misconduct. Id. ¶¶ 142–45. Morris also reported Director Pizziketti to Crime Lab administrators, who took no action against her. Id. ¶¶ 13, 246–48.

Instead, Crime lab administrators took action against plaintiffs and others. In late September or early October of 2014, Deputy Counsel Hogan, Director Wickenheiser, and Director Pizziketti initiated an investigation into plaintiffs' collaboration during the TrueAllele training sessions. Compl. ¶ 295. Captain Poulin began interrogating

---

4. Rafferty had compiled a list of old, CPI–method cases to be re-analyzed once TrueAl-

lele went online in the Crime Lab. Compl. ¶ 172.

the thirty-seven forensic scientists who had participated in the TrueAllele training courses. Id. ¶ 302. As plaintiffs explain, "[q]uestions were raised as to whether the collaboration between the scientists on the training was cheating or otherwise unethical." Id. ¶ 303.

Eventually, fifteen forensic scientists, including all three plaintiffs, were implicated in this ethics investigation. Compl. ¶ 304. According to plaintiffs, defendants falsely asserted that plaintiffs had cheated on the TrueAllele training in retaliation for complaints about Director Pizziketti's improper testimony, as a way to prevent the program's implementation, and in retaliation for plaintiffs' advocacy efforts in favor of TrueAllele. Id. ¶¶ 248–51, 295–97.

Rafferty, the only male employee who spoke out in support of Morris and other female employees, also happened to be the only male Crime Lab scientist implicated in the ethics investigation. Compl. ¶¶ 306–07. According to plaintiffs, a number of other male scientists who had engaged in the same collaboration, but who had not spoken up, were not investigated or disciplined. Id. ¶¶ 456–57.

Things came to a head on December 30, 2014, when plaintiffs were escorted to a conference room and informed by Director Wickenheiser and Major Munro that they were being reassigned to the State Police academy. Compl. ¶¶ 311–12. Plaintiffs were then "marched as a group to the second floor in plain view of Crime Lab employees, [where] their [access] cards were confiscated and they were escorted from the building." Id. ¶ 313. Plaintiffs had never before had any negative marks on their employment records.[5] Id. ¶¶ 6, 31, 53.

Between December 30, 2014 and February 24, 2015, Morris, Lee, and Rafferty reported to work each day by heading to an empty conference room at the State Police Academy. Compl. ¶ 314. According to plaintiffs, they spent eight hours in these conference rooms each day with no work assignments. Id. ¶ 316.

Plaintiffs further allege that, in February 2015, Director Wickenheiser and Major Munro contacted the Schenectady County District Attorney and told him that plaintiffs had "engaged in an ethical violation and cheated on the TrueAllele Training." Compl. ¶¶ 318–24. Plaintiffs contend that defendants also sought to have them prosecuted for obtaining the TrueAllele training certificate "under false pretenses." See id.

On February 24, 2015, plaintiffs were served with Notices of Discipline seeking their termination from the State Police. Compl. ¶ 328. These disciplinary notices charged plaintiffs with impermissibly sharing the TrueAllele training materials with fellow forensic scientists and with failing to report that unauthorized sharing of those training materials to Crime Lab administrators. Id. ¶¶ 332–34. The Notices of Discipline issued against plaintiffs eliminated the implementation teams for TrueAllele and Lean Six Sigma and halted the Crime Lab's adoption of those techniques. Compl. ¶¶ 210–11, 235.

Morris, Lee, and Rafferty were suspended without pay and grieved the disciplinary charges through their union. Compl. ¶¶ 335, 338, 398. In April 2015, Director Wickenheiser told other Crime Lab employees that plaintiffs would not be returning to work (despite the ongoing union grievance process) because they had "lied and cheated." Id. ¶¶ 336–37. Plaintiffs

5. Morris had one personnel complaint filed against her in 2014, but upon review, it was found unsubstantiated. Compl. ¶¶ 6–8.

allege that defendants caused Morris and Rafferty's names to be published in the local newspaper as individuals who had been involved in "cheating allegations" and who had been suspended without pay. Id. ¶¶ 325–26.

In late summer and early fall of 2015, Morris participated in a series of arbitration hearings regarding her disciplinary grievance. Compl. ¶¶ 25, 574. Lee and Rafferty testified in Morris's favor during these hearings. Id. ¶ 574. Ultimately, however, the arbitrator affirmed the State Police's decision to discharge Morris, which became final on January 21, 2016. Id.

The grievance process produced better initial results for Lee and Rafferty. On May 6, 2015, Rafferty was offered a settlement through the union grievance process. Compl. ¶ 339. According to plaintiffs, the State Police represented to Rafferty that he could return to his old job as a forensic scientist if he would accept this grievance settlement. Id. ¶¶ 340–48. Rafferty accepted. Id. ¶ 348.

However, when Rafferty returned to work on May 11, 2015, he was not permitted to return to his old office but was instead assigned to a training room on the Crime Lab's first floor. Compl. ¶¶ 349–351. This change in office location left Rafferty isolated from his former co-workers and without access to certain materials and locations within the Crime Lab. Id. ¶¶ 353–54. Since his reinstatement, Rafferty has also been shunned by his colleagues. Id. ¶¶ 355–60.

On May 26, 2015, Lee was also offered a grievance settlement. Compl. ¶ 400. Just like Rafferty, the State Police promised Lee that she could return to her job duties if she settled her grievance. Id. ¶¶ 401–10. Lee also accepted the settlement. Id. ¶ 399.

However, upon her return to work on June 1, 2015, Lee was assigned to an office

room on the first floor and subjected to "enhanced supervision by the Crime Lab's administration." Compl. ¶ 412. And like Rafferty, this change left Lee isolated from her colleagues. Id. ¶¶ 413–15.

On July 30, 2015, Director Wickenheiser visited the training room and berated Rafferty and Lee for "over an hour" and "told them that they had to admit to being unethical." Compl. ¶ 361. According to plaintiffs, Director Wickenheiser has repeatedly threatened Rafferty and Lee with criminal charges. Id. ¶¶ 362–63.

Plaintiffs allege that this harassing behavior has continued after their reinstatement. Since their return to work, both Lee and Rafferty have been subjected to ethics training that consists of a "hypothetical" fact pattern that mirrors the TrueAllele training sessions that gave rise to the Notice of Discipline. Compl. ¶¶ 360, 416–17. If plaintiffs fail to admit that this fact pattern presents an ethical violation, they are forced to "rework" their answers. Id. Rafferty has since completed all ethics assignments but to date has been given no job duties. Id. ¶ 430.

As another example, in September 2015, Director Wickenheiser told Rafferty that he had notified his old colleagues that Rafferty had confessed to an ethical violation and would be returning to work soon. Compl. ¶¶ 364–67. Rafferty, for his part, denies confessing to any ethical violation and denies one ever occurred. Id.

Plaintiffs further allege that Captain Poulin has made "disparaging" comments to Rafferty in front of female scientists. Compl. ¶ 370. According to plaintiffs, Captain Poulin has also forced Rafferty "to stand before her and read aloud from the Crime Lab's ethics code." Id. ¶ 372. She has also singled out Rafferty for a "special ethics assignment" that other Crime Lab employees did not receive. Id. ¶ 373.

On one occasion, Captain Poulin showed Rafferty and a female scientist pictures of herself when she was "young and thin." Compl. ¶ 374. When Rafferty "seemed disinterested," Captain Poulin informed Rafferty that she had seen him violating the State Police's internet policy by reading online news. Id. ¶ 375. According to plaintiffs, Captain Poulin made this statement even though she permitted female scientists to read the news on the internet. Id. ¶¶ 376–77.

On another occasion, Captain Poulin "made a point of discussing her previous work in a bar and attire of mini-skirts." Compl. ¶ 371. Captain Poulin also told Rafferty "I'll show you mine, if you show me yours" when handing him a work assignment. Id. ¶ 553. Rafferty complained about Captain Poulin's unfair treatment to Director Wickenheiser and to his union representative, but nothing was done about it. Id. ¶¶ 379–88.

As a result of defendants' actions, Rafferty and Lee began to attend counseling sessions with a psychologist through the State Police's Employee Assistance Program ("EAP"). Compl. ¶ 389. In an effort to deter plaintiffs from continuing to use the EAP, defendants allegedly instituted a new policy that required anyone visiting the EAP to use their own sick leave. Id. ¶ 390. However, plaintiffs allege that this policy has never been imposed on anyone besides Rafferty and Lee. Id. ¶ 391. In a similar vein, Captain Poulin told Rafferty he is required to provide 24–hour notice before attending an EAP counseling session, a requirement not applied to other Crime Lab employees. Id. ¶¶ 392–93.

On September 14, 2015, legal counsel for Lee and Rafferty informed the State Police that a civil rights lawsuit would be filed against defendants. Compl. ¶ 423. In response, Lee was called to a meeting where defendants attempted to discourage her from filing suit. See id. ¶¶ 424–25.

On October 22, 2015, Morris, Lee, and Rafferty filed separate charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against the State Police. Compl. ¶ 107. In response to this action, Crime Lab administrators prohibited Lee and Rafferty from attending technical training or receiving technical readings necessary to maintain compliance and accreditation as DNA analysts. Id. ¶¶ 450–51. Further, Crime Lab administrators forced Rafferty to forfeit his new office and move into a much smaller space that had previously been used to analyze sperm samples. Id. ¶¶ 394–95. When Rafferty complained to Director Pizziketti, she told him the space was "acceptable" and directed him to occupy the area. Id. ¶ 396. In contrast, ethics trainees who had not filed an EEOC charge were moved into nicer offices. Id. ¶ 397.

For instance, a female forensic scientist named Elizabeth Staude has received more favorable treatment than either Lee or Rafferty since settling her own grievance arising from a Notice of Discipline issued to her as a result of the TrueAllele investigation. Compl. ¶¶ 433–442. According to plaintiffs, Staude has since been reintegrated into the Biosciences Division of the Crime Lab and given Rafferty's former office. Id. ¶¶ 443–47.

On November 19, 2015, the EEOC issued plaintiffs separate notices of their right to sue. Compl. ¶ 108. Plaintiffs filed this civil rights claim three months later, on February 15, 2016. Just over a week after that, Superintendent D'Amico drafted a letter to the editor of the local newspaper entitled "Police Lab's Integrity is Paramount." Id. ¶¶ 631–32. According to plaintiffs, the letter, which was published in the newspaper, came in response to their decision to file a federal lawsuit

against defendants. Id. ¶ 635. Plaintiffs claim certain statements made by Superintendent D'Amico in the letter suggested that they lack professional integrity and that they "admitted" they were guilty of the ethical violations. Id. ¶¶ 616–18; 637–38.

## III. DISCUSSION

■ Where, as here, "a plaintiff seeks to amend [the] complaint while a motion to dismiss is pending, a court 'has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint.'" Hamzik v. Office for People with Dev. Disabilities, 859 F.Supp.2d 265, 273–74 (N.D.N.Y. 2012) (quoting Roller Bearing Co. of Am., Inc. v. Am. Software, Inc., 570 F.Supp.2d 376, 384 (D. Conn. 2008)).

Under Rule 15, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2); see also Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'").

Defendants contend plaintiffs' cross-motion to amend should be denied, since "it is well established that leave to amend a complaint need not be granted where amendment would be futile." Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003). However, beyond their futility argument, defendants have offered no other basis—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice—which might justify denial of plaintiffs' request to amend. Accordingly, plaintiffs' cross-motion to amend will be granted and the allegations in plaintiffs' second amended complaint will be analyzed to determine whether one or more of the Causes of Action must be dismissed as futile.

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002); see also IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 389 (2d Cir. 2015) ("The standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss.").

■ "To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Ginsburg v. City of Ithaca, 839 F.Supp.2d 537, 540 (N.D.N.Y. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Although a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief' (FED. R. CIV. P. 8(A)(2)), more than mere conclusions are required." Id. "Indeed, '[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims." Id.; see also Twombly, 550 U.S. at 570, 127 S.Ct. 1955 (requiring "only

enough facts to state a claim to relief that is plausible on its face").

■ "When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." Faiaz v. Colgate Univ., 64 F.Supp.3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.). In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

### A. Eleventh Amendment Immunity

As an initial matter, defendants contend that plaintiffs' various claims for money damages under 42 U.S.C. § 1983 are barred by the Eleventh Amendment's guarantee of state sovereign immunity insofar as these claims are asserted against (1) plaintiffs' current or former employer, the State Police; and (2) the various individual defendants in their *official* capacities.

■ Technically, "[a] claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction." Morales v. New York, 22 F.Supp.3d 256, 268 (S.D.N.Y. 2014) (citation omitted). In other words, this kind of argument is properly made under Rule 12(b)(1), a different provision of the Federal Rules of Civil Procedure than the one under which defendants' motion appears to have been made. Nevertheless, because "subject matter jurisdiction is not waivable and may be raised at any time by a party or by the court sua sponte," Lyndonville

Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 700 (2d Cir. 2000), the best course of action is to resolve this issue now.

■ "As a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress." Jackson v. Battaglia, 63 F.Supp.3d 214, 219–20 (N.D.N.Y. 2014) (citation omitted).

■ This immunity "extends beyond state agencies to state officials at those agencies working on behalf of the state (i.e. in their official capacities)." Emmons v. City Univ. of N.Y., 715 F.Supp.2d 394, 406 (E.D.N.Y. 2010); see also Marino v. City Univ. of N.Y., 18 F.Supp.3d 320, 334 (E.D.N.Y. 2014) ("A suit against a state official in his or her official capacity for monetary damages is treated as a suit against the state.").

Although the sheer length of plaintiffs' proposed pleading creates unnecessary confusion, the eighteen-count second amended complaint appears to assert four § 1983 claims (First, Second, Eleventh, and Twelfth Causes of Action). As defendants point out, only the first two of these § 1983 claims clearly indicate that they are asserted against the individual defendants "individually"; i.e., that these claims are not being asserted against the defendants in their "official capacities." Compl. ¶¶ 467–509.

■ As relevant here, the State of New York has not waived its sovereign immunity from § 1983 claims in federal court. See Jackson, 63 F.Supp.3d at 220. Nor has Congress validly abrogated New York's sovereign immunity from these claims. Id. Accordingly, to the extent that plaintiffs' § 1983 claims may be construed

as being asserted against the individual defendants in their *official* capacities, see Compl. ¶¶ 573–88, any such claims must be dismissed.[6]

The same reasoning applies to plaintiffs' § 1983 claims insofar as one or more of these claims, such as the Eleventh Cause of Action, may be construed as being asserted against the State Police itself. See, e.g., Simons v. New York, 472 F.Supp.2d 253, 260–61 (N.D.N.Y. 2007) (dismissing § 1983 claims against the New York State Police on Eleventh Amendment immunity grounds).

 In fact, "New York has not waived its Eleventh Amendment immunity with respect to NYSHRL claims brought in federal court." Allessi v. N.Y. State Dep't of Corr. & Cmty. Supervision, 16 F.Supp.3d 221, 225 (W.D.N.Y. 2014). Accordingly, plaintiffs' NYSHRL claims must also be dismissed insofar as they are asserted against the State Police. See, e.g., Deadwiley v. N.Y. State Office of Children & Family Servs., 97 F.Supp.3d 110, 117 (E.D.N.Y. 2015) (finding plaintiff's NYSHRL claim against state agency barred by the Eleventh Amendment).

 Further, the State of New York has not consented to be sued in federal court for, and Congress has not validly abrogated state sovereign immunity from, "claims arising under state common law." Soloviev v. Goldstein, 104 F.Supp.3d 232, 244 (E.D.N.Y. 2015) (collecting cases). Accordingly, plaintiff's state common law claims (Fifteenth, Sixteenth, Seventeenth,

and Eighteenth Causes of Action) must also be dismissed insofar as they are asserted against the State Police.

### B. 42 U.S.C. § 1983

 "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993). Thus, a § 1983 claim requires a plaintiff to show (1) the deprivation of a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting under the color of state law. 42 U.S.C. § 1983.

Plaintiffs' remaining § 1983 claims, which are asserted against the individual defendants, allege First Amendment retaliation as well as violations of plaintiffs' Fourteenth Amendment right to equal protection. Hafer v. Melo, 502 U.S. 21, 22, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("The Eleventh Amendment does not bar § 1983 personal-capacity suits against state officials in federal court.").

### 1. First Amendment Retaliation

 "A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was

---

**6.** It is recognized that the doctrine of Ex parte Young permits a suit to proceed against an otherwise immune entity if a plaintiff names a state official in his or her official capacity provided the plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." Brown v. New York, 975 F.Supp.2d 209, 222 (N.D.N.Y.2013) (D'Agostino, J.) (citations omitted). In this case, the "wherefore" clause of plaintiffs' proposed pleading requests only monetary relief in the form of compensatory and punitive damages, as opposed to some form of prospective equitable relief, like reinstatement. Accordingly, the doctrine of Ex parte Young is inapplicable here. State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 96 (2d Cir. 2007).

protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" Matthews v. City of N.Y., 779 F.3d 167, 172 (2d Cir. 2015) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)).

■■■■ "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

■■■ "A court conducts a two-step inquiry to determine whether a public employee's speech is protected: 'The first requires determining whether the employee spoke as a citizen on a matter of public concern.'" Matthews, 779 F.3d at 172 (quoting Garcetti, 547 U.S. at 418, 126 S.Ct. 1951).

"This step one inquiry in turn encompasses two separate subquestions: '(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke' as a citizen 'rather than solely as an employee.'" Matthews, 779 F.3d at 172 (quoting Jackler v. Byrne, 658 F.3d 225, 234 (2d Cir. 2011)).

"If the answer to either question is no, that is the end of the matter. If, however, both questions are answered in the affirmative, the court then proceeds to the second step of the inquiry, commonly referred to as the Pickering analysis: whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" Matthews, 779 F.3d at 172 (quoting Lane v. Franks, ——— U.S. ———, 134 S.Ct. 2369, 2380, 189 L.Ed.2d 312 (2014)); see also Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Plaintiffs' proposed pleading alleges that Morris, Lee, and Rafferty repeatedly objected to the use of the CPI method of DNA analysis in circumstances where its use ran directly counter to a broad consensus shared by the scientific community. According to plaintiffs, the manner in which defendants have routinely used the CPI method "can result in innocent people being found guilty of crimes that they did not commit." Pls.' Opp'n at 11–12.

Plaintiffs allege that they repeatedly lodged these objections with their superiors at the Crime Lab and also reported these alleged improprieties to external accreditation agencies like the Scientific Working Group on DNA Analysis Methods. Plaintiffs' pleading further alleges that Morris, Lee, and Rafferty repeatedly warned their superiors that Director Pizziketti was routinely misrepresenting her professionals credentials to the court during criminal trials. As a result, Director Pizziketti was testifying about issues that fell outside her sphere of competence, misconduct that posed the same danger of false convictions. Plaintiffs allege these objections caused defendants to falsely implicate them in a sham ethics investigation that resulted in, inter alia, Morris's termination and Lee and Rafferty's suspension.

### i. Matter of Public Concern

■■■ "Speech is on a matter of public concern and therefore a protected activity 'if it relates to any matter of political, social, or other concern to the community.'" Dillon v. Suffolk Cnty. Dep't of Health Servs., 917 F.Supp.2d 196, 205 (E.D.N.Y. 2013) (quoting Johnson v. Gan-

im, 342 F.3d 105, 112 (2d Cir. 2003)). "In analyzing whether speech addresses a matter of public concern, courts must 'focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.'" Id. (quoting Lewis v. Cowen, 165 F.3d 154, 163–64 (2d Cir. 1999)).

 At this stage, plaintiffs have sufficiently alleged that the speech set forth above is on matters of public concern; i.e., plaintiffs have alleged serious misconduct by State Police employees during criminal investigations that poses an ongoing danger of false or otherwise improper convictions. See Hoyt v. Andreucci, 433 F.3d 320, 330 (2d Cir. 2006) ("[C]oncerns raised to the government about the lawfulness of public officials' actions ... relate[ ] to a matter of public concern").[7]

### ii. Speech as a Citizen

 "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." Garcetti, 547 U.S. at 421, 126 S.Ct. 1951. As the Second Circuit has explained, courts ask "two questions to determine whether a public employee speaks as a citizen: (A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" Matthews, 779 F.3d at 173 (citing Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 203–04 (2d Cir. 2010). In sum, speech is not protected if it is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." Weintraub, 593 F.3d at 203 (internal quotation marks omitted).

7. However, plaintiffs' contentions about the implementation of Lean Six Sigma, an inter-

 At this stage, plaintiffs have also sufficiently alleged that they were speaking on these issues as citizens to survive a motion to dismiss. To be sure, plaintiffs' everyday job responsibilities seem to have included "proper" DNA analysis, making the question of whether complaints about instances in which the use of the CPI method was "improper" a closer question.

But accepting plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor, their objections to the CPI method and to Director Pizziketti's misconduct, which went beyond internal grievances and were also lodged with external agencies, fell outside their job descriptions and was not included as part of the day-to-day expectations of their employment. Matthews, 779 F.3d at 174 (finding "policy-oriented speech" to leadership expressing concern over police department policies constituted private speech because it "was neither part of his job description nor part of the practical reality of his everyday work"); see also Dillon, 917 F.Supp.2d at 209 (finding element satisfied where plaintiff complained about systemic workplace issues "extending outside of her own personal duties" and was thus the speech "of a concerned citizen seeking to bring certain wrongdoing to light"). Accordingly, plaintiffs' § 1983 retaliation claims survive dismissal.

### C. Discrimination Claims

Defendants also seek dismissal of plaintiffs' Title VII and the NYSHRL claims for gender discrimination, a hostile work environment, and retaliation (Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Thirteenth Causes of Action).

nal workplace efficiency program, fail to satisfy this requirement.

## 1. Gender Discrimination

■ At the pleadings stage, Title VII "requires a plaintiff asserting a discrimination claim to allege two elements: (1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015).

■ "As to the first element, an employer discriminates against a plaintiff by taking an adverse employment action against him." Vega, 801 F.3d at 85. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted).

■ "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted). "Examples of materially adverse changes including termination of employment, a demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Vega, 801 F.3d at 85.

■ "As to the second element, an action is 'because of' a plaintiff's race, color, religion, sex, or national origin where it was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." Vega, 801 F.3d at 85 (citation omitted). In other words, "a plaintiff in a Title VII case need not allege 'but-for' causation." Id.

■ "At the pleadings stage, then, a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." Vega, 801 F.3d at 87 (citing Littlejohn v. City of N.Y., 795 F.3d 297, 310 (2d Cir. 2015)).

Notably, unlike other claims asserted in their proposed amended pleading, plaintiffs' Title VII claims against the State Police are not barred by sovereign immunity. See, e.g., Gengo v. City Univ. of N.Y., 479 Fed.Appx. 382, 383 n.2 (2d Cir. 2012) (summary order) ("Title VII specifically abrogates state sovereign immunity."). However, plaintiffs' proposed amended complaint raises different concerns.

■ First, individual defendants like Captain Poulin, Major Munro, Superintendent D'Amico, Deputy Counsel Hogan, Director Pizziketti, and Director Wickenheiser are not subject to liability under Title VII. Gomez v. N.Y. City Police Dep't, 191 F.Supp.3d 293, 302 (S.D.N.Y. 2016) ("There is no individual liability under Title VII."). Accordingly, plaintiffs' Title VII claims must be dismissed to the extent they are asserted against these individual defendants, in their official capacities or otherwise. See Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012) ("Employers, not individuals, are liable under Title VII."); Falcon v. City Univ. of N.Y., 2016 WL 3920223, *6 (E.D.N.Y. July 15, 2016) (collecting cases rejecting "Title VII claims against individuals in their official capacities because those claims are duplicative" of claims against the employer).[8]

8. Notably, however, NYSHRL discrimination claims, which are examined "with the same analytical lens as corresponding Title VII–based claims," Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007), may give rise to personal liability where, as here, defendants are super-

Second, defendants correctly argue that many of the allegedly discriminatory incidents about which plaintiffs complain are barred by Title VII's 300–day statute of limitations.

"Title VII requires that individuals aggrieved by acts of discrimination file a charge with the [U.S. Equal Employment Opportunity Commission] within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days 'after the alleged unlawful employment practice occurred.'" Vega, 801 F.3d at 78–79 (quoting 42 U.S.C. § 2000e–5(e)(1)); see also Jiles v. Rochester Genesee Regional Transp. Auth., 217 F.Supp.3d 688, 690 (W.D.N.Y. 2016) ("Because New York is a so-called dual-filing or deferral state, a plaintiff must file a charge under Title VII within 300 days of the occurrence of a discriminatory act.").

▮▮▮ As the Supreme Court has explained, the word "practice" in the Title VII employment discrimination context refers to "a discrete act or single 'occurrence,'" meaning that a "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" Vega, 801 F.3d at 79 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110–11, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Consequently, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113, 122 S.Ct. 2061.

Morris, Lee, and Rafferty each filed separate charges of discrimination with the EEOC on October 22, 2015, making December 26, 2014 the relevant 300–day time period for purposes of Title VII. See Compl. ¶ 107. Accordingly, plaintiffs' allegations of discriminatory acts occurring prior to that date are time barred and must be dismissed.

▮▮▮ Plaintiffs seek to have these incidents considered timely under Title VII's "continuing violation exception." Under this exception, "if a plaintiff files a timely EEOC charge 'as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone.'" Edner v. NYCTA–MTA, 134 F.Supp.3d 657, 663 (E.D.N.Y. 2015) (quoting Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 155–56 (2d Cir. 2012)).

▮▮▮ Generally speaking, "[t]he continuing violation exception applies to cases involving specific discriminatory policies or mechanisms such as discriminatory seniority lists, or discriminatory employment tests." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993) (internal citations omitted), overruled on other grounds by Greathouse v. JHS Sec. Inc., 784 F.3d 105 (2d Cir. 2015).

▮▮▮ Accordingly, this doctrine is inapplicable to "discrete acts" of discrimination, even if they are "related to acts alleged in timely filed charges." Edner, 134 F.Supp.3d at 664 (citation omitted); see also Cabrera v. NYC, 436 F.Supp.2d 635, 642 (S.D.N.Y. 2006) ("The Second Circuit has repeatedly ruled that 'multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.'" (citation omitted)).

"Such discrete acts include termination, disparate disciplining, and negative performance evaluations." Edner, 134 F.Supp.3d at 664 (collecting cases); see also Pietri v. N.Y.S. Office of Court Ad-

visory officials who have the power "to do more than carry out personnel decisions made by others." Fanelli [v. New York], 51 F.Supp.3d [219] at 234 [(E.D.N.Y. 2014)].

min., 936 F.Supp.2d 120, 134 (E.D.N.Y. 2013) ("Discrete acts of discrimination include termination, failure to promote, denial of transfer, or refusal to hire.").

 Plaintiffs contend that Director Pizziketti's instances of bullying and mistreating other female forensic scientists at the Crime Lab constituted the kind of policy or mechanism that would permit application of the continuing violation doctrine to their claims. But "[t]he continuing violation[ ] doctrine is disfavored and courts are hesitant to apply it absent a showing of compelling circumstances." Boza–Meade v. Rochester Hous. Auth., 170 F.Supp.3d 535, 545 (W.D.N.Y. 2016) (citation omitted).

A review of plaintiffs' proposed pleading reveals that it does little to even attempt to tie this alleged bullying behavior to one or more of plaintiffs themselves, rather than to other, unidentified female forensic scientists around the Crime Lab. To the extent the otherwise-untimely incidents laid out in plaintiffs' proposed pleading can be associated with one or more identifiable plaintiffs, such as the claims that Director Pizziketti would assign Morris extra work on certain occasions or "undermin[e]" Morris's "competency" by humiliating her at certain staff meetings, these incidents, even assuming they are sufficiently "adverse" to warrant Title VII protection, are precisely the kind of discrete acts to which the continuing violation exception does not apply. See Compl. ¶¶ 278–80.

Because these incidents do not plausibly form part of a "continuing violation" for purposes of Title VII, they are time-barred. See Boza–Meade, 170 F.Supp.3d at 545 ("A continuing violation may not be premised on discrete incidents of discrimination not related to discriminatory policies or mechanisms." (citation omitted)).

This conclusion leaves for consideration plaintiffs' gender discrimination claims arising from their removal from daily work responsibilities and reassignment to the State Police Academy on December 30, 2014, the Notices of Discipline issued against them on February 24, 2015 that resulted in suspension, Morris's eventual termination, and the unfair treatment—including loss of certain work privileges—to which Lee and Rafferty were subjected after their reinstatement to the Crime Lab.

Defendants contend these timely allegations fail to suffice to state plausible claims for gender- or gender-association discrimination. As for Morris and Lee, the two female plaintiffs, defendants point out that the proposed pleading draws specific causal connections between the adverse employment actions these plaintiffs suffered and their complaints about Director Pizziketti's improper testimony and/or their outspoken advocacy for TrueAllele and Lean Six Sigma, not their gender. As for Rafferty, the lone male plaintiff, defendants argue that, at best, he was swept up in the ethics investigation for speaking out against Director Pizziketti and the CPI method and in support of other forensic scientists who had been implicated in the scandal, not because of his association with disfavored members of a protected class.

 "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Littlejohn, 795 F.3d at 312 (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)).

■ After carefully considering the proposed pleading in light of the parties' arguments, defendants are correct. At bottom, a Title VII plaintiff must allege sufficient facts to demonstrate that he or she suffered an adverse employment action that was motivated, at least in part, by discriminatory animus directed toward one or more protected characteristics.

Plaintiffs focus on allegations that Director Pizziketti, a female supervisor, "bullied" and "belittled" unnamed female subordinates, publicly undermined Morris at certain staff meetings, and assigned her extra work. Cf. Davis v. NYS Dep't of Corr. Attica Corr. Facility P.O. Box 149 Attica, N.Y. 14011, 46 F.Supp.3d 226, 236 (W.D.N.Y. 2014) ("Whispering, gossiping, and making negative comments about an employee [ ] do not rise to the level of an adverse employment action . . . .").

Plaintiffs further allege that they later became embroiled in an ethics investigation into the thirty-seven forensic scientists who had participated in the TrueAllele training courses and that eventually fifteen scientists, including plaintiffs, were accused of cheating on the training. Jaeger v. N. Babylon Union Free Sch. Dist., 191 F.Supp.3d 215, 227 (E.D.N.Y. 2016) ("Courts in this Circuit have held that investigations alone are . . . not adverse employment actions." (citation omitted)).

According to plaintiffs' complaint, defendants falsely asserted that plaintiffs had cheated on the TrueAllele training in retaliation for complaints about Director Pizziketti's improper testimony, as a way to prevent the program's implementation, and in retaliation for plaintiffs' advocacy efforts in favor of TrueAllele. Compl. ¶¶ 248–51, 295–97. Of these fifteen scientists accused of impropriety, defendants targeted only a single male—Rafferty. As plaintiffs' proposed pleading explains, Rafferty was the only male employee who spoke out in support of Morris and the other female scientists.

However, plaintiffs go on to allege in detail that all of the other female forensic scientists who had been accused and even disciplined, such as Elizabeth Staude, have since received vastly more favorable treatment than Morris, Lee, or Rafferty in exchange for, inter alia, dropping further advocacy efforts in favor of adopting the TrueAllele method. In other words, plaintiffs' proposed pleading fails to give rise to a *plausible* inference that one or more of the adverse actions taken against them occurred because they are females (or, in Rafferty's case, by virtue of his association with certain females).

■ Rather, these plaintiffs allege they were singled out and treated *differently* than other females because they attacked Director Pizziketti's professional misconduct and refused to acquiesce to a complete and total abandonment of the TrueAllele program, as urged by Director Wickenheiser, Director Pizziketti, and the other defendants. Accordingly, plaintiffs' gender- and gender-association discrimination claims must be dismissed. Moultrie v. Carver Found., 669 Fed.Appx. 25, 26 (2d Cir. 2016) (summary order) ("Due to the absence of any specific allegations in [plaintiff's] complaint giving rise to an inference of [discrimination], the complaint must be dismissed for failure to state a claim upon which relief can be granted.").

### 2. Hostile Work Environment

Defendants contend that plaintiffs' hostile work environment claims must be dismissed for similar reasons.

■ "A hostile work environment claim 'is a wholly separate cause of action designed to address other types of *work place* behavior, like constant jokes and ridicule or physical intimidation.'" Hughes v.

Xerox Corp., 37 F.Supp.3d 629, 648 (W.D.N.Y. 2014) (citation omitted).

■ "To establish a hostile work environment under Title VII, ... a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Littlejohn, 795 F.3d at 320–21 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Littlejohn, 795 F.3d at 321 (quoting Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014)). "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Id.

■ "In determining whether a plaintiff suffered a hostile work environment, [a court] must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Littlejohn, 795 F.3d at 321 (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367).

■ At the outset, it is recognized that "a hostile work environment claim is treated as a continuing violation and treated as timely if one act contributing to the claim occurred within the 300–day period ...." Baroor v. N.Y. City Dep't of Educ., 362 Fed.Appx. 157, 159 (2d Cir. 2010) (summary order). Accordingly, the otherwise-untimely allegations set forth in plaintiffs' proposed pleading will be considered in evaluating the plausibility of their hostile work environment claims.[9]

■ Yet even considering these time-barred allegations in conjunction with plaintiffs' timely allegations, any hostile work environment claim must fail. As defendants point out, merely pleading a series of generally unpleasant, undesirable, or even harmful behavior is insufficient; rather, a plaintiff must plausibly allege that the hostile work environment at issue was created because of one or more of their protected characteristics. See Robinson v. Harvard Prot. Servs., 495 Fed.Appx. 140, 141 (2d Cir. 2012) (summary order) (reiterating the causal requirement for hostile work environment claims)

■ As with the discrimination claims set forth above, plaintiffs repeatedly and specifically allege that Morris, Lee, and Rafferty were "targeted" for more unfavorable treatment, even in contrast to other female forensic scientists, because of their TrueAllele advocacy and their attempt to curtail Director Pizziketti's unprofessional behavior, not because of any characteristic protected by the anti-discrimination laws.

Rafferty's claim that Captain Poulin sexually harassed him fares little better. As defendants point out, only a few of the alleged incidents about which Rafferty complains are even arguably "sexual" in nature. In contrast, several other incidents involve little more than increased scrutiny or marginally unfavorable treatment.

---

**9.** At the same time, however, courts have cautioned that "[h]ostile work environment is not a vehicle for resurrecting time-barred claims of discrimination." Hughes, 37 F.Supp.3d at 648.

In short, plaintiffs' *subjective* belief that they were subjected to a hostile work environment based on their membership or association with a protected class—"however strongly felt—is insufficient to satisfy [their] burden at the pleading stage." Lenart v. Coach Inc., 131 F.Supp.3d 61, 68 (S.D.N.Y. 2015) (citation omitted). Accordingly, plaintiffs' hostile work environment claims will be dismissed. See Ortiz v. Metro. Transp. Auth., 615 Fed.Appx. 702, 703 (2d Cir. 2015) (summary order) (affirming grant of summary judgment on hostile work environment claim where "most of the complained-of conduct bears no apparent connection to [plaintiff's] sex, race, or national origin").

Plaintiffs' § 1983 claim against the individual defendants alleging a violation of their Fourteenth Amendment rights to equal protection (Twelfth Cause of Action) must fail for the same basic reasons set forth in this section. See Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996) (observing that "sex-based discrimination, including sexual harassment, may be actionable under § 1983 as a violation of equal protection"); Cowan v. City of Mt. Vernon, 95 F.Supp.3d 624, 643 (S.D.N.Y. 2015) (observing that "[s]exual harassment that rises to the level of gender discrimination is actionable under § 1983 as violative of the Fourteenth Amendment right to equal protection").

In short, the conduct of the individual defendants is not "independently sufficient to create a hostile work environment" warranting § 1983 liability. See Cowan, 95 F.Supp.3d at 644. And plaintiffs' Fourteenth Cause of Action, which alleges a gender discrimination claim based on the New York State Constitution, is also dismissed as duplicative of this failed § 1983 claim. See G.D.S. ex rel. Slade v. Northport–East Northport Union Free Sch.

Dist., 915 F.Supp.2d 268, 280 (E.D.N.Y. 2012) (collecting cases).

### 3. Retaliation

Defendants contend plaintiffs' retaliation claims must also be dismissed. According to defendants, the allegedly retaliatory conduct began before Rafferty or Lee engaged in any protected conduct.

"[F]or a retaliation claim to survive a ... motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him; (2) 'because' he has opposed any unlawful employment practice." Vega, 801 F.3d at 90.

In the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination." Vega, 801 F.3d at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

"This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination... '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" Vega, 801 F.3d at 90 (quoting White, 548 U.S. at 64, 126 S.Ct. 2405).

"As for causation, a plaintiff must plausibly plead a connection between the act and his engagement in *protected activity.*" Vega, 801 F.3d at 90. "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action." Id. "Unlike Title VII discrimination claims, however, for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the

retaliation was a 'but-for' cause of the employer's adverse action." Id.

■ Lee and Rafferty's retaliation claims survive defendants' bid for dismissal. "Courts in the Second Circuit have taken a 'generous' view of retaliatory acts at the motion to dismiss stage." Ingrassia v. Health & Hosp. Corp., 130 F.Supp.3d 709, 723 (E.D.N.Y. 2015).

Plaintiffs allege that on September 14, 2015, they sent "correspondence" to the State Police advising defendants that they would be filing a civil rights lawsuit. Plaintiffs allege that in response, defendants instituted a new EAP policy that has been imposed against *only* Lee and Rafferty in retaliation for this protected conduct. Cf. Cifra v. Gen. Elec. Co., 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.")

Further, plaintiffs allege that after they filed their EEOC complaints in October 2015, defendants denied Lee and Rafferty access to certain necessary technical training required to stay current and certified in their professional field. Compl. ¶¶ 450–51. Drawing all inferences in plaintiffs' favor at this early stage, they have sufficiently alleged that these actions were taken in retaliation for plaintiffs' engagement in protected activity. Accordingly, these claims survive defendants' motion to dismiss.

### D. Common Law Claims

Defendants also contend that plaintiffs' state law claims for defamation and libel must be dismissed.

■ "Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name. Generally, spoken defamatory words are slander; written defamatory words are libel." Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001) (citations and internal quotation marks omitted).

■ "To prevail on a claim for either libel or slander under New York law, plaintiff must show (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting [defamation] *per se*, and (vii) not protected by privilege." Neal v. Asta Funding, Inc., 2014 WL 3887760, at *2 (S.D.N.Y. June 17, 2014) (citations and internal quotation marks omitted).

Defendants argue that plaintiffs' defamation claim against Director Wickenheiser (Fifteenth Cause of Action) must be dismissed because the allegedly false, malicious statement at issue—that Wickenheiser informed other Crime Lab employees that plaintiffs had "lied and cheated and would not be returning to work"—is protected by the "common interest" privilege.

■ The "common interest" qualified privilege protects communications "made by one person to another upon a subject in which both have an interest." Chao v. Mount Sinai Hosp., 476 Fed.Appx. 892, 894–95 (2d Cir. 2012) (summary order) (quoting Liberman v. Gelstein, 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992)).

According to defendants, this privilege applies because Director Wickenheiser made this statement only to other Crime Lab employees; that is, in the employment context. However, "[t]he rationale for applying the privilege in these circumstances is that so long as the privilege is not abused, the flow of information between persons sharing a common interest should

not be impeded." <u>Liberman</u>, 80 N.Y.2d 429 at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344.

■ Here, plaintiffs allege that this statement was made in connection with an ethics investigation that Director Wickenheiser *knew* to be a sham, intended to punish plaintiffs for speaking out about TrueAllele rather than to discover the truth of the allegations. Under those circumstances, plaintiffs have sufficiently alleged that Director Wickenheiser abused any qualified privilege he may have otherwise possessed in connection with this statement. <u>See</u> <u>Boyd v. Nationwide Mut. Ins. Co.</u>, 208 F.3d 406, 410.

■ Next, defendants argue plaintiffs' defamation claim against Director Wickenheiser and Major Munro (Sixteenth Cause of Action) must be dismissed because the allegation that these defendants, "in sum and substance," reported plaintiffs to the Schenectady County District Attorney's Office for "engag[ing] in an ethical violation and cheat[ing] on [the] TrueAllele training" is privileged as part of a criminal investigation.

Again, however, plaintiffs' pleading challenges the good-faith basis for this statement, since plaintiffs allege that both Director Wickenheiser and Major Munro knew full well that any report to an investigative agency about one or more of the plaintiffs having committed an ethical violation would be patently false.

■ As for plaintiffs' proposed defamation claims against Superintendent D'Amico arising from his February 25, 2016 Letter to the Editor (Seventeenth and Eighteenth Causes of Action), defendants argue that Superintendent D'Amico merely "truthfully addressed the allegations publicly" in response to plaintiffs having initiated this publicly accessible civil rights lawsuit.

But again, plaintiffs' pleading alleges that Superintendent D'Amico has been knowingly involved in the plot to undermine TrueAllele and discredit its supporters. Further, plaintiffs allege that neither Lee nor Rafferty's settlements involved any admissions of untruthfulness. At this early stage, the story told in plaintiffs' entire pleading leading up to Superintendent D'Amico's newspaper submission permits these claims to survive dismissal.

## IV. CONCLUSION

"[T]he price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." <u>DM Research, Inc. v. Coll. of Am. Pathologists</u>, 170 F.3d 53, 55 (1st Cir. 1999).

After evaluating the eighteen causes of action identified by plaintiffs in the voluminous allegations contained in their, 74–page, 641–paragraph proposed amended pleading, the bulk of those claims must be dismissed.

However, plaintiffs' § 1983 and Title VII retaliation claims, as well as their common law claims against Major Munro, Director Wickenheiser, and Superintendent D'Amico, remain for discovery.

Therefore, it is

ORDERED that

1. Plaintiffs' cross-motion to amend is GRANTED;

2. Plaintiffs' second amended complaint is accepted for filing and shall be deemed the operative pleading;

3. Defendants' motion to dismiss plaintiffs' second amended complaint is GRANTED in part and DENIED in part;

4. Plaintiffs' § 1983 claims against defendant State Police are DISMISSED;

5. Plaintiffs' NYSHRL claims against defendant State Police are DISMISSED;

6. Plaintiffs' common law claims for defamation and libel against defendant State Police are DISMISSED;

7. Plaintiffs' § 1983 official-capacity claims against defendants Captain Poulin, Major Munro, Director Pizziketti, Director Wickenheiser, Superintendent D'Amico, and Deputy Counsel Hogan are DISMISSED;

8. Plaintiffs' Title VII claims for gender discrimination, a hostile work environment, and retaliation against defendants Captain Poulin, Major Munro, Director Pizziketti, Director Wickenheiser, Superintendent D'Amico, and Deputy Counsel Hogan are DISMISSED;

9. Plaintiffs' NYSHRL claims for gender discrimination and a hostile work environment against defendants Captain Poulin, Major Munro, Director Pizziketti, Director Wickenheiser, Superintendent D'Amico, and Deputy Counsel Hogan are DISMISSED;

10. Plaintiffs' Title VII claims for gender discrimination and a hostile work environment against defendant State Police are DISMISSED;

11. Plaintiffs' § 1983 individual-capacity claims for a violation of Rafferty's right to equal protection against defendants Captain Poulin, Major Munro, Director Pizziketti, Director Wickenheiser, Superintendent D'Amico, and Deputy Counsel Hogan are DISMISSED;

12. Plaintiffs' gender discrimination claims based on the New York State Constitution are DISMISSED;

13. Plaintiffs' Title VII retaliation claims against defendant State Police REMAIN for discovery;

14. Plaintiffs' § 1983 individual-capacity claims for First Amendment retaliation against defendants Captain Poulin, Major Munro, Director Pizziketti, Director Wickenheiser, Superintendent D'Amico, and Deputy Counsel Hogan REMAIN for discovery;

15. Plaintiffs' common law claims for defamation and libel against defendants Major Munro, Director Wickenheiser, and Superintendent D'Amico REMAIN for discovery;

16. Plaintiffs' Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Twelfth, Thirteenth, and Fourteenth Causes of Action are DISMISSED;

17. Plaintiffs' First, Second, Tenth, Eleventh, Fifteenth, Sixteenth, Seventeenth, and Eighteenth Causes of Action REMAIN for discovery; and

18. Defendants shall answer those remaining Causes of Action in plaintiffs' second amended complaint on or before August 28, 2017.

IT IS SO ORDERED.